T.C. Memo. 2021-122

UNITED STATES TAX COURT

TRIBUNE MEDIA COMPANY f.k.a. TRIBUNE COMPANY
& AFFILLIATES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CHICAGO BASEBALL HOLDINGS, LLC, NORTHSIDE ENTERTAINMENT
HOLDINGS, LLC, f.k.a. RICKETTS ACQUISITION, LLC, TAX MATTERS
PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20940-16, 20941-16.          Filed October 26, 2021.

<u>Joel V. Williamson</u>, <u>Thomas Lee Kittle-Kamp</u>, <u>Peter M. Price</u>, <u>Anthony D. Pastore</u>, <u>Daniel S. Emas</u>, <u>James B. Kelly</u>, <u>Scott M. Stewart</u>, <u>John W. Horne</u>, <u>Elizabeth P. Mazzocco</u>, and <u>Phillip M. Goldberg</u>, for petitioners.

<u>Justin D. Scheid</u>, <u>Thomas F. Harriman</u>, <u>William Benjamin McClendon</u>, <u>James M. Cascino</u>, <u>Grubert R. Markley</u>, <u>Rogelio A. Villageliu</u>, and <u>Brandon S. Cline</u>, for respondent.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, Judge:  In 2009, Tribune Media Co. f.k.a. Tribune Co. & Affiliates (Tribune) formed Chicago Baseball Holdings, LLC (CBH), with the Ricketts family, with Tribune contributing the Chicago Cubs Major League Baseball team (Chicago Cubs or Cubs) (and related assets) and the Ricketts family contributing cash.  CBH then distributed cash to Tribune.  This type of transaction is a "disguised sale," which neither party disputes.  Although the name "disguised sale" might seem pejorative, disguised sales are well recognized, and they are taxable.[1]

CBH entered into two tranches of debt, one funded by a commercial lender and the other funded by the Ricketts family.  Tribune guaranteed collection of the debt.  To the extent Tribune is deemed ultimately responsible for the debt, the distribution would be considered debt financed and would not be taxable.

The Commissioner issued a notice of deficiency to Tribune and a notice of final partnership administrative adjustment (FPAA) as to CBH for 2009.  In those notices, the Commissioner determined that the series of transactions was taxable.

---

[1]See sec. 707(a)(2)(B); see also sec. 1.707-3, Income Tax Regs.  Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

**[*3]** In support of those notices, the Commissioner argues that the debt funded by the Ricketts family is not bona fide debt and thus should be disregarded for purposes of the debt-financed distribution rule. The Commissioner further argues that the likelihood that Tribune would ever be called upon to satisfy its guaranty is so remote that the guaranty should be disregarded.

Tribune entered into a bona fide guaranty of the debt, and the fact that having to fulfill that guaranty is remote is not sufficient to disregard it. The debt funded by the Ricketts family, however, is not bona fide debt for tax purposes and will be disregarded.

## Introduction

President Ronald Reagan has often been referred to as "the Gipper." This nickname came about from his role as an actor in "Knute Rockne: All American", a 1940 Warner Brothers movie about the legendary football coach from Notre Dame. Reagan played George Gipp, an all-American football player who died prematurely. Legend has it that, from his hospital bed, Gipp implored his coach to tell the team to "win just one for the Gipper."[2] Reagan delivered that poignant line

---

[2]H.W. Brands, Reagan: The Life 41 (2015).

[*4] in the movie, and from then on, he was associated with both football and the Gipper.

President Reagan arguably had much closer ties to baseball, and one could credibly argue that it was his involvement with the Chicago Cubs that launched his acting career. After graduating from college, Reagan sought to enter the field of sports broadcasting.[3] His first job landed him in Davenport, Iowa, and later Des Moines, Iowa, where he did play-by-play announcing of a wide variety of sports.[4] One of the sports he called was baseball, more specifically, Chicago Cubs baseball.

Announcing a Chicago Cubs game was particularly challenging because Reagan was sitting in a studio in Des Moines while the Cubs were playing in Chicago. And in the 1930s, there was no broadcast television for Reagan to watch. In fact, Reagan wasn't watching the games at all. The studio would receive reports of what was happening in the game by Morse code via a ticker.[5] Aided by a telegraph operator, Reagan would turn the dots and dashes into an enthralling play-

---

[3]Ronald Reagan, An American Life 60 (1990).

[4]Lou Cannon, Governor Reagan: His Rise To Power 35, 43 (2003).

[5]Bob Spitz, Reagan: An American Journey 127 (2018); Cannon, supra note 4, at 43.

[*5] by-play that had many people believing he was reporting live from the game.[6]

For effect, he would add recorded crowd applause from a record turntable.[7] He

became "'the voice of Chicago baseball' throughout the prairie states."[8]

One game was uniquely challenging to call. As the story goes, it was in the

mid-1930s when the Cubs were playing their arch[9] rival, the St. Louis Cardinals.

It was 0-0 in the ninth inning, and Billy Jurges was batting against Dizzy Dean,

who was pitching for the Cardinals. And the ticker went out.[10]

But the young announcer didn't miss a beat. If he told the listeners the

ticker stopped working, he would have lost his audience. If he announced a hit or

an out, the actual game result might be different from what he announced. So

instead, Reagan improvised foul ball after foul ball, the inaccuracy of which would

be immaterial to the outcome of the game. His improvised play-by-play included a

---

[6]Reagan, supra note 3, at 72; Cannon, supra note 4, at 43; Brands, supra note 2, at 30; Spitz, supra note 5, at 127.

[7]Spitz, supra note 5, at 127.

[8]Spitz, supra note 5, at 128.

[9]Pun intended, although it wasn't until two decades later that construction began on St. Louis' Gateway Arch.

[10]Reagan, supra note 3, at 72-73; Cannon, supra note 4, at 44; Brands, supra note 2, at 30; Spitz, supra note 5, at 133.

[*6] would-be home run that went foul by a foot and a scuffle in the stands as two kids fought over another foul ball.  When the ticker began working again, it turned out that Jurges had popped out on the first pitch.[11]  Reagan's listeners were none the wiser.

By all appearances, Reagan called a live baseball game.[12]  It's only by digging into what really happened that the appearances give way to reality.[13]  So with that in mind, we dig into what really happened with the sale of the Cubs.[14]

---

[11]Reagan, supra note 3, at 73; Cannon, supra note 4, at 44; Brands, supra note 2, at 30; Spitz, supra note 5, at 133.

[12]Reagan's telling was so believable that the unprecedented number of foul balls may have been reported to Ripley's Believe It Or Not.  Reagan, supra note 3, at 73.

[13]As for how a Des Moines radio announcer wound up in California, in 1937, Reagan accompanied the Cubs to spring training on Catalina Island, off the coast of Los Angeles.  While in California, he did a screen test that landed him a contract with Warner Brothers, the eventual distributor of "Knute Rockne:  All American."  Reagan, supra note 3, at 77-81; Cannon, supra note 4, at 48-49; Brands, supra note 2, at 35-37, 41.

[14]Coincidentally, it was President Reagan who signed into law the amendments to section 707 that give us the disguised sale rule found in section 707(a)(2)(B) that applies to these cases.  Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 73, 98 Stat. at 591-592.

[*7]                              FINDINGS OF FACT

I.    Tribune Background and Purchase of Chicago Cubs

In 1847, Tribune began publishing the Chicago Tribune newspaper. Tribune went public in 1983. During the year at issue, Tribune was organized as a corporation under the laws of Delaware and filed its Federal income tax return as a consolidated group with Tribune as the parent company. When it filed its petition, Tribune's principal place of business was Chicago, Illinois.

In 1981, Tribune bought the Chicago Cubs baseball team from the Wrigley family for $21.1 million; it also purchased Wrigley Field for $600,000. Tribune held the Cubs in its wholly owned subsidiary, Chicago National League Ball Club, LLC (CNLBC).

II.   Tribune's Leveraged Buyout

In September 2006, the Tribune board of directors explored "strategic alternatives" to Tribune's existing business model. In April 2007, Tribune accepted an investment proposal from Sam Zell. Under this proposal, Tribune's Employee Stock Ownership Plan (ESOP) would buy Tribune's outstanding stock for $34 a share. Tribune had to borrow the funds to repurchase its shares as part of the ESOP transaction, and when the transaction closed in late 2007, Tribune was $12.8 billion in debt.

**[*8]**   Mr. Zell invested $315 million during the ESOP transaction; in exchange he received a warrant to acquire 40% of Tribune's common stock and became Tribune's president and chairman. As part of the ESOP transaction, Tribune converted from a C corporation to an S corporation effective December 31, 2007.

## III.   The Ricketts Family

The Ricketts family has considerable wealth. Joe Ricketts started TD Ameritrade, a discount brokerage firm, which grew significantly before it merged with Toronto-Dominion Bank. The family's primary source of wealth stems from TD Ameritrade and their ongoing partial ownership of the company.

Along with their significant wherewithal, the Ricketts family has an enduring love of Cubs baseball. In the mid-2000s, Thomas Ricketts, Joe Ricketts' son, noticed Tribune's financial troubles and convinced his family that if Tribune ever put the Cubs up for sale, they should compete to buy the team. Thomas Ricketts lined up a bank to support the family in such a transaction and identified an appropriate family trust that could finance an acquisition. When Tribune announced the sale of the Cubs, the Ricketts family was already prepared.

## IV.   Initial Phases of the Cubs Transaction

Tribune's plan to sell the Cubs was announced at the same time as the company's leveraged buyout. The announcement stated that Tribune would use

[*9] the proceeds from the sale to pay down the debt it incurred for the leveraged buyout. During its financial troubles, Tribune decided to focus on its "core assets," which did not include the Cubs; so Tribune chose to sell the team. At the time, Tribune considered itself a media company. Although the Cubs are a legacy team in the Major League Baseball (MLB) organization, the team was not a significant source of cashflow for Tribune.

Tribune began to solicit interested buyers in April 2007. In May 2007, Tribune hired J.P. Morgan Securities, Inc. (J.P. Morgan), to assist with selling the Chicago Cubs and related assets (collectively, Cubs assets). The Cubs assets included the Chicago Cubs, its Dominican baseball operations, Wrigley Field, Tribune's interest in Comcast SportsNet Chicago, LLC (CSN Chicago), and its interests in other related partnerships.

J.P. Morgan gauged buyers' interest in two kinds of ownership structures: (1) a single partnership owning all Cubs assets and (2) two separate partnerships, one holding the Chicago Cubs and the other holding Wrigley Field. Over 100 parties expressed interest in the single partnership structure and 60 expressed interest in the dual partnership structure.

Bidding on the Cubs assets went through three phases. The first phase began in the latter half of 2007 when MLB reviewed the financial information and

**[*10]** initial applications of interested buyers. MLB cleared 10 bidding groups. Tribune provided these 10 groups a descriptive memorandum that outlined Tribune's desire to sell a 95% interest in the Cubs with an option for the 95% interest holder to buy the remaining 5% interest after 12 years. Tribune prepared the descriptive memorandum before the bidding process.

The second bidding phase occurred in mid to late 2008. The 10 bidding groups submitted preliminary, nonbinding proposals, which Tribune, J.P. Morgan, and other advisers evaluated. From that evaluation, they narrowed the number of bidding groups to five. After another due diligence phase, Tribune narrowed the group to three potential buyers: (1) the Ricketts family, led by Thomas Ricketts; (2) a group led by Marc Utay; and (3) a group led by Hersh Klaff.

The third bidding phase began in late 2008. Tribune and CNLBC evaluated the bids from the three remaining bidders. After reviewing the revised bids from the groups, Tribune chose to pursue a transaction with the Ricketts family.

Tribune and the Ricketts family began more detailed negotiations. Thomas Ricketts viewed a 95% stake in the Cubs as a risky investment because expenses are fixed and income fluctuates with ticket sales, making profitability unpredictable. From his perspective, the negotiations with Tribune were "contentious." Nevertheless, the Ricketts family abided by Tribune's required

[*11] transaction structure: a leveraged partnership with 95% owned by the Ricketts family and 5% owned by Tribune along with a debt-financed distribution to Tribune (Cubs transaction). The Cubs transaction structure was dictated by Tribune and nonnegotiable.

In the spring of 2009, after negotiations between the two sides slowed, Tribune asked Mr. Utay to reengage in the bidding process. Mr. Utay believed that Tribune asked his group to reengage because Tribune was motivated to sell the Cubs but might not get a deal done with the Ricketts family and hoped it could sell the Cubs to either his group or the Ricketts family. Mr. Utay believed his group had "some chance of winning" but hesitated to reengage because Tribune and the Ricketts family were in the midst of negotiations. To alleviate this hesitation, Mr. Utay asked Tribune to cover all of his group's historic and projected bidding expenses. After negotiations, Tribune agreed to pay $2.5 million of the group's expenses. These expenses consisted primarily of legal fees.

[*12] Ultimately, Tribune proceeded with the Ricketts family. In August 2009, Tribune and the Ricketts family, operating through Ricketts Acquisition LLC (RAC), signed the formation agreement for the Cubs transaction.[15]

V. Tribune's Bankruptcy

During negotiations for the Cubs transaction, Tribune and some of its subsidiaries filed for chapter 11 bankruptcy. The bankruptcy arose from Tribune's inability to service its debts following the leveraged buyout. Chandler Bigelow, Tribune's senior vice president and chief financial officer during the Cubs transaction, believed Tribune's bankruptcy stemmed from losing advertising revenue during the 2008 financial crisis, which had a significant effect on Tribune's cashflow. According to Mr. Bigelow, the cashflow decreased to a significant enough extent that the company's interest expenses relative to income caused the board of directors to file for bankruptcy. It is Mr. Bigelow's view that "there's a big difference between filing for bankruptcy and being bankrupt." According to him, at the time of the bankruptcy filing, Tribune had $300 million in cash on the balance sheet.

---

[15]RAC later changed its name to Northside Entertainment Holdings, LLC, which is the tax matters partner of Chicago Baseball Holdings, LLC, and petitioner in docket No. 20941-16.

**[\*13]** Tribune's bankruptcy proceeding lasted four years. During this time, its cash position grew to almost $3 billion.

In August 2009, Tribune moved the bankruptcy court to approve and authorize the sale of the Cubs to the Ricketts family. In September, the bankruptcy court authorized the sale and ordered that Tribune's financial obligations under the Cubs transaction be entitled to administrative expense priority. In July 2012, the bankruptcy court confirmed Tribune's reorganization plan.

VI.    MLB Approval Process and Sale Oversight

Before an owner of an MLB team sells or disposes of a team, MLB must approve the transaction. Any proposed sale or disposition of an MLB team must be voted on and approved by 75% of MLB teams.

Tribune's sale of 95% of its interest to the Ricketts family had to be approved through this process. When considering the disposition, MLB viewed the continuity of ownership resulting from Tribune's retention of a 5% interest as a positive factor.

A significant aspect of MLB approval is an internal debt service rule that limits the level of debt a team may maintain. The rule aims to ensure a team's debt does not impede its economic stability and ability to perform. Related-party debt that is not secured by team assets is not treated as debt under this rule. MLB

[*14] reviewed and approved the Cubs' ability to finance its operations and service its debt under the debt service rule.

VII.    Creation and Management of CBH

On October 27, 2009 (closing date), Tribune and RAC closed the Cubs transaction and formed CBH, with Tribune and RAC as partners.  On formation, Tribune contributed the Cubs assets to CBH and RAC contributed $150 million. At the time, the Cubs assets had a fair market value of $769,976,627.  CBH also assumed $35,241,562 in Cubs liabilities, bringing the net fair market value of the contribution to $734,735,065.  On the closing date, CBH made a special distribution to Tribune of $704,872,594 (special distribution) as required by the formation agreement.

CBH was managed by a board of directors, which could have between 2 and 20 members.  RAC could appoint up to 19 members and Tribune could appoint 1. The initial board consisted of one Tribune appointee and four members of the Ricketts family.

VIII.  Percentage Shares and Common Capital

The following table shows the ownership percentages and common capital of CBH's members upon formation of CBH.  Tribune held its interests through Cubs, LLC, Tribune Sports, Premium Tickets, LLC, and DQ, LLC.

| [*15] Member | Percentage share | Common capital |
|---|---|---|
| RAC | 95.0000% | $150,000,000 |
| Cubs, LLC | 3.5978% | 15,101,181 |
| Tribune Sports | 1.3688% | 5,745,359 |
| Premium Tickets, LLC | 0.0011% | 4,522 |
| DQ, LLC | 0.0323% | 135,781 |
| Total | 100% | 170,986,843 |

Despite the interest percentages amounting to 95% for RAC and 5% for Tribune, common capital shows a different ownership scheme. Of the total common capital, $150 million is attributable to RAC and $20,986,843 is attributable to Tribune. This translates to RAC's owning 87.726% of common capital and Tribune's owning 12.274%. At trial, Thomas Ricketts did not know why, and he appeared surprised to learn that the common capital percentages did not match the ownership interest percentages.

IX. Operating Support Agreement

On the closing date, Chicago Cubs Baseball Club LLC, RAC, Thomas Ricketts, Ricketts Educational Trust, RAC Education Trust OSA, LLC (RAC OSA), CBH, and the Office of the Commissioner of Baseball executed the

[*16] operating support agreement. The operating support agreement specified that RAC OSA would provide unsecured subordinated loans to the Cubs as requested by the MLB Commissioner. The operating support agreement provided a financial safety net for the Cubs to ensure the team could pay its players in the event of financial collapse. The agreement provided MLB with assurance that the team had operating revenue even amidst economic uncertainty.

Pursuant to the agreement, RAC, Thomas Ricketts, the Joe and Marlene Ricketts Grandchildren's Trust (trust), and RAC OSA all committed to providing this financial safety net. These parties also agreed that RAC OSA would maintain cash or cash equivalents of at least $35 million. But the operating support agreement expressly prohibited the use of RAC OSA funds to pay any debts of CBH or the Cubs.

Every party to the agreement that committed to provide backup funds to CBH was either a Ricketts family member or an entity owned by (or for the benefit of) Ricketts family members. RAC wholly owned RAC OSA. The trust was an intergenerational Ricketts family trust established to pay the secondary education expenses for Ricketts family members.

[*17] X.     Financing the Cubs Transaction

The Ricketts family and Tribune financed the Cubs transaction with a combination of equity and debt.  The Ricketts family contributed the equity through the trust, which wholly owned RAC.  The trust transferred $191,985,182 to RAC, which then transferred $150 million to CBH as an equity investment.  RAC used the remainder of the transferred cash to fund the operating support agreement, to fund a small portion of the subordinated debt (sub debt), and to pay various transaction costs.  The Ricketts family decided to use the trust to fund the Cubs purchase because the family viewed the team as a long-term family investment.  Thomas Ricketts preferred for the trust to be the only source of equity in the transaction and did not want any outside sources of equity.

From the beginning of the bidding process, Tribune intended the sale of the Cubs to include as much debt as possible; the leveraged partnership structure was nonnegotiable.  The leveraged financing came from two tranches of debt:  senior debt and sub debt.  CBH was funded with $425 million of senior debt from unrelated third parties and $248,750,000 of sub debt from RAC Finance, an entity closely related to RAC and owned by the Ricketts family.  CBH is a limited liability company (LLC), and neither Tribune nor RAC had an obligation to

**[\*18]** contribute capital to CBH.  Further, the members of CBH were not liable for the debts and obligations of CBH.

### A.    The Senior Debt

Several banks lent CBH a total of $425 million.[16]  Under the terms of the senior credit agreement governing these loans, CBH could use the senior debt only to (1) pay transaction costs, (2) fund a debt service reserve account, and (3) make the special distribution to Tribune.

On the closing date, CBH issued and sold $250 million of the senior debt secured notes to third parties.  The notes were issued in three series, set to mature in 2018, 2020, and 2022.  An agreement executed by CBH and the buyers of the notes required CBH to use the proceeds to pay down $250 million of the senior debt, bringing the senior debt down to $175 million.

---

[16]These loans totaling $425 million were term loans.  Banks also lent $50 million in revolving loans to CBH, but those loans are not part of the senior debt at issue.  This financing was effectively bridge financing, a short-term loan that provides financing for a transaction.  It is meant to be repaid after the borrower closes the transaction.  See Container Corp. v. Commissioner, 134 T.C. 122, 124 (2010), aff'd per curiam without published opinion, 107 A.F.T.R.2d (RIA) 2011-1831 (5th Cir. 2011).

**[*19]** The parties to these cases stipulated that the senior debt is bona fide debt for Federal income tax purposes. But they disagree as to whether the senior debt should be characterized as recourse or nonrecourse to Tribune.

B.     The Sub Debt

Sub debt was also used to fund CBH. RAC and Tribune chose to use sub debt after a failing financial market left the parties with few options. RAC pulled as much debt funding as possible from third-party lenders as senior debt.

The largest source of the sub debt was Marlene Ricketts, mother of Thomas Ricketts, through MMR Financing, LLC. Thomas Ricketts considered the MMR Financing to be Marlene Ricketts' "private funds." Marlene Ricketts was never asked to purchase an equity interest. The family's strategy was to fund the equity part of its investment only from the trust because it existed outside the family's estate.

MMR Financing and RAC created a separate entity from which to fund the sub debt and to hold the corresponding promissory note: RAC Education Trust Finance, LLC (RAC Finance). MMR Financing contributed $250,750,000 to RAC Finance, and RAC contributed $18 million. RAC was the sole manager of RAC Finance. Thomas Ricketts was executive vice president of RAC and had the authority to make decisions for RAC Finance. Neither MMR Financing nor RAC

[*20] Finance was a member of CBH, and neither entity had participation or voting rights in CBH.

On the closing date, RAC Finance transferred $248,750,000 to CBH in exchange for the subordinate promissory note (sub debt note). Although the ultimate transfer came from RAC Finance, Marlene Ricketts funded most of the sub debt with her private funds from MMR Financing.

The parties in these cases dispute whether the sub debt is debt or equity for Federal income tax purposes.

### 1. Subordination

The sub debt was subordinated to the senior debt under the subordination agreement. The subordination agreement makes payment of the sub debt conditional on full payment of the senior debt. The agreement provides that CBH must pay the senior debt in full before making payments other than "permitted payments" on the sub debt. To be considered "permitted payments," the payments must be for regularly scheduled interest payments made if no default occurred, the payments must be permitted under the cash waterfall, see infra pp. 21-22, and the interest rate must not exceed 6.5%.

The agreement also prioritizes the senior debt in the event of a dissolution or reorganization. It provides that in the case of dissolution, winding up,

[*21] reorganization, or liquidation, the sub debt holders will transfer and assign to the senior debt lenders any claims or demands that arise. The subordination agreement also grants J.P. Morgan, as collateral agent of the senior debt lenders, a power of attorney over the sub debt holders during any default. If a dissolution or reorganization event occurs, any payments made toward the sub debt must be applied instead to the senior debt. In the event that any payments are made to the sub debt creditors, those payments will be placed in a trust for the benefit of the senior debt lenders to apply to payment or prepayment of the senior debt.

Additionally, the sub debt creditors covenant not to commence or participate in any enforcement proceedings for collection of the sub debt until the senior debt is paid in full.

## 2. The Cash Waterfall

As part of the Cubs transaction, J.P. Morgan, as collateral agent, and CBH entered into a cash collateral agreement. This agreement governed the flow of cash entering into CBH to create the cash waterfall.

Generally, a "cash waterfall" is an agreement between a creditor and a borrower dictating the order in which the borrower will apply incoming cash to its obligations. The "waterfall" in the analogy refers to cash coming into the

[*22] borrower's organization at the top of the revenue stream and its descending "flow" through payment obligations.

In CBH's cash waterfall, revenues related to certain Cubs assets, such as gate receipts, local media revenue, and MLB Central Fund distributions,[17] would be deposited into the cash waterfall revenue account. Under the cash collateral agreement, after revenues in excess of roughly $50 million are transferred to a separate account to pay the Cubs' operating expenses, the remaining funds are to be applied to the cash waterfall in the following order: First and second to accounts to service the senior debt; third to accounts to pay fees and other obligations; and fourth to the distribution account. Funds in the distribution account are then applied in the following order: First for specified capital contributions; second to pay principal and interest on operating support agreement loans; third to discretionary capital expenditures; and fourth (and last) to pay the sub debt. The sub debt is only paid if revenue remains after every previous obligation is met through the cash waterfall.

---

[17]MLB Central Fund distributions are distributions MLB teams receive from national television revenues.

**[*23]**      3.      <u>Benefits to the Sub Debt Holders</u>

The sub debt note conferred benefits on the lender. One benefit was the right of first refusal to purchase equity in CBH. This right did not apply to the Ricketts family who could purchase equity in CBH as a matter of course.

The sub debt lender also received 17 specified privileges under the sub debt note. These privileges include the right to use Wrigley Field for private functions, clubhouse access, complimentary premium seating, season ticket options, hospitality benefits, premier parking, and the right to participate in postseason award ceremonies. These privileges are not transferable to any person who was not a sub debt holder.

      4.      <u>Maturity of the Sub Debt</u>

The sub debt had a 15-year maturity and was set to mature on October 27, 2024.[18] That maturity date, however, is not as fixed as it might appear. The 15-year maturity was not actually fixed because its maturity depended on the maturity

---

[18]The sub debt note provides that CBH promises to repay the debt "fifteen (15) years following the Consummation Date (as defined in the Subscription Agreement) (the 'Maturity Date')." The subscription agreement defines the consummation date as "the date of the consummation of the transactions * * * contemplated by the Formation Agreement." The Cubs transaction closed on October 27, 2009, so the maturity date is 15 years later, on October 27, 2024.

**[\*24]** of the senior debt, a fact noted by one of the Commissioner's experts, Howard Gellis. As previously discussed, the sub debt principal could not be repaid until the senior debt was paid in full. Because the senior debt holders could extend or change the manner, terms, and times of payment,[19] the sub debt maturity date could also change. This potential extension meant that the maturity date of the sub debt was not fixed. As explained by Mr. Gellis, the senior debt holder could, in effect, extend the maturity date of the sub debt indefinitely:

> So the subordinated debt has a maturity of 15 years, but even that isn't even protected here, because in the subordination--in the subordination agreement, the senior lenders are allowed to extend the maturity of their debt, including the notes * * * So if the senior debt extends their maturity beyond the original maturity of the sub-debt, the sub-debt has no ability to say anything about that or to collect, even at its own original maturity.[20]

---

[19]The subordination agreement provides:

Without notice to or the consent of the SDF Agent or the Subordinated Creditors, the Collateral Agent and/or the applicable Senior Lenders may, at any time and from time to time and without impairing or releasing the subordination herein made, do any one or more of the following: (a) (i) change the manner, place or terms of payment, or change or extend the time of payment, of the Senior debt * * *

[20]One of Tribune's experts, Douglas Skinner, contends that this 15-year maturity date is fixed. His contention, however, fails to take into account the interplay between the payment of the senior debt and the maturity of the sub debt.

[*25]      5.      <u>Repayment of the Sub Debt</u>

CBH was not obligated to repay the sub debt principal until the sub debt note reached maturity. At CBH's discretion, CBH may pay the total principal amount after five years from the closing date of the Cubs transaction.

     6.      <u>Interest</u>

     a.      <u>Interest Terms</u>

The sub debt had a stated interest rate of 6.5%. The sub debt note obligated CBH to pay the annual accumulated interest on the sub debt on the last business day in December.

But CBH may pay the interest due only to the extent permitted by the subordination agreement and the amount of income flowing through the cash waterfall. Under the subordination agreement, CBH may make a payment only if "there is cash available for such payment pursuant to the terms and conditions of the Cash Collateral Agreement" and "such payment is permitted under the Cash Collateral Agreement and the Subordination Agreement." Any interest that remains unpaid because the payment is not permitted under the cash collateral agreement (the agreement governing the cash waterfall) is added to the principal amount of the loan.

[*26] If CBH does not have sufficient income to pay the interest in full, and the lender makes an election, CBH must make the remaining payment in kind (PIK). This PIK feature provides that if CBH could not pay the interest due, RAC Finance, the lender, could elect to receive up to 39.5% of the interest due in cash. The remaining interest due would be added to the principal of the note and be treated as principal instead of accrued and unpaid interest. If RAC Finance exercised the PIK feature, it could exchange the sub debt note for a new note reflecting the historic principal plus the PIK-ed interest added to the principal.

On the closing date, RAC Finance elected to trigger the PIK "until such election is revoked in accordance with * * * the Subordination Note." For the duration of the sub debt, Tribune was required to pay only 39.5% of the annual interest in cash.

### b. CBH's Interest Payments

CBH timely made all required interest payments, whether in cash or in kind.

### 7. Default and Enforcement

The sub debt lender had limited enforcement rights. RAC Finance could not demand payment on the sub debt except in the case of default or other limited

[*27] circumstances.[21]  Default occurs if (1) CBH fails to pay any principal or interest when due; (2) the total outstanding principal (excluding any PIK interest added to the principal) of the senior and sub debts exceeds $750 million; and (3) payment of the entire principal amount of the senior debt is accelerated.  These limited enforcement rights meant that RAC Finance had no power to compel CBH to make its sub debt interest payments.

The subordination agreement further weakened RAC Finance's ability to enforce repayment.  The subordination agreement overrode the sub debt note until the senior debt was paid in full.  While the senior debt was still outstanding, the subordination agreement precluded holders of the sub debt from enforcing any rights or remedies granted to them under the sub debt note, including their right to payments.  The subordination agreement overrode any rights granted to RAC Finance by other loan documents.  As Mr. Gellis explained, the subordination agreement created a "complete and utter standstill" of RAC Finance's ability to pursue remedies while the senior debt remained outstanding.

---

[21]These limited circumstances include death of the lender and a three-month period in 2022.

[*28]         8.      Priority of the Sub Debt

The sub debt ranked higher than equity but lower than the senior debt at CBH. The parties do not appear to dispute this fact, but they disagree on whether the sub debt was debt or equity for Federal income tax purposes. At trial, both parties presented experts on the issue.

XI.   CBH's Capitalization

CBH was expected to meet its financial obligations. Although the parties agree that CBH had sufficient cashflow to make timely interest payments on the sub debt, the parties differ in their views on the sufficiency of CBH's capitalization. CBH's debt-to-equity ratio was just below 4:1. We accept the calculation of Israel Shaked, petitioners' expert, who calculated this ratio by finding CBH had $673,750,000 of debt (combining the senior and sub debts) and $171 million in equity.

XII.   Marketing and Potential Sale of the Sub Debt

The Ricketts family contemplated selling sub debt notes issued by CBH to bring in additional investors. The family considered selling up to $75 million of the sub debt to 8 to 10 investors. The Ricketts family was serious enough about selling some of the sub debt that they created marketing materials targeting individual investors.

[*29] The Ricketts family marketed the sub debt to private investors through a private placement memorandum and an investor presentation. The private placement memorandum marketed the sub debt as an investment and acknowledged its inherent risk. The memorandum referred to the buying opportunity as "debt" and as an "investment." The memorandum referred to potential buyers as "investors." It also required any potential investors to represent that they were purchasing the notes for investment purposes only.

The placement memorandum stated a variety of risks involved in investing in the subordinated notes. One of these stated risks is the partnership's ability to repay. The memorandum explains that the partnership's ability to repay is dependent upon the financial performance of the assets, including attendance at Cubs games, broadcast revenues, player development and contracts, and competition for entertainment revenue. Another enumerated risk was the subordinated nature of the notes. The memorandum mentions that the sub debt notes are illiquid and without an established market. It further warns that the subordination agreement restricts repayment until the senior debt is fully paid and includes a PIK feature that would defer expected annual interest payments. The memorandum concludes with a final warning: "Investors should have the financial ability to sustain a complete loss of their investment."

[*30] The marketing materials also stated that investors could receive privileges associated with the sub debt if they chose to invest. These privileges included the same benefits granted to the sub debt holders, such as private use of Wrigley Field, use of the "Investors Club" suite, preferred ticketing options, VIP treatment, and the opportunity to travel with the team. It also granted any note holders the right of first refusal equity offering in the Cubs.

The Ricketts family ultimately did not sell interests in the sub debt. Although there was some effort to market the debt, the record does not establish that anyone was genuinely interested in acquiring any of the sub debt. Ultimately, Marlene Ricketts funded the entire sub debt.

XIII. The Guaranties

On the closing date, Tribune executed two guaranties, the senior debt guaranty and the sub debt guaranty (collectively, guaranties). The guaranties were at all times part of the proposed Cubs transaction. When Tribune executed the guaranties, it had no credit rating due to its pending bankruptcy proceedings.

The guaranties were guaranties of collection of principal and interest; they were not guaranties of payment. A payment guaranty obligates the guarantor to pay the loan during a specified period following the borrower's default. In contrast, the timeframe within which a guarantor must make good on a collection

[*31] guaranty is uncertain. A lender may enforce a collection guaranty only after the lender has obtained a judgment against the borrower and the judgment is unsatisfied, or the borrower is insolvent, or could not be compelled to pay.

Both guaranties include similar terms. Neither guaranty may be enforced until: (1) CBH fails to make a payment and the debt is accelerated; (2) the lenders have exhausted all creditor remedies against CBH; and (3) the lenders have not collected the full amount of the principal and interest guaranteed by Tribune. But the guaranties differ on some key issues. The sub debt guaranty adds an additional hurdle to enforcement: The senior debt must be paid in full before Tribune's sub debt guaranty obligations can be triggered. And the senior debt guaranty provides that, upon written request from the senior lenders, Tribune must assign the guaranty to any person who acquires all or substantially all of Tribune. Tribune may not otherwise assign or transfer the guaranty.

The parties to the senior debt haggled over the terms of the guaranties. Numerous drafts of the senior debt guaranty were exchanged by the parties, resulting in a final guaranty that was twice the length of the draft initially proposed by Tribune. The sub debt guaranty was largely replicated from the senior debt guaranty. The parties to the sub debt guaranty exchanged multiple drafts of the document before finalizing the agreement. Although there were several drafts, the

[*32] Ricketts family did not negotiate the terms of the guaranties. As Thomas Rickets testified, they would not have negotiated a guaranty that would shield Tribune from payment if the guaranties were called.

In an internal accounting memo, Tribune discussed the financial details of the Cubs transaction. In this memo, Mr. Chakiris, Tribune's corporate assistance controller during the Cub's transaction, analyzed whether the guaranties were contingent or noncontingent obligations under Generally Accepted Accounting Principles (GAAP). A contingent obligation is one where payment is probable and dependent on a future event to occur. A noncontingent obligation is an obligation that it not dependent on a future event.

The memo concluded that RAC received "no perceived benefit" from the sub debt guaranty because RAC and the sub debt are "economically aligned." The memo found that the senior debt guaranty did not improve RAC's ability to obtain debt from third parties and stated that "it is not currently likely that the * * * [guaranties] will have a material impact on * * * [Tribune's] operations, cash flows or liquidity." It concluded that the possibility of the guaranties' being called was "remote." Consequently, it placed "no value" on the guaranties' contingent and noncontingent liabilities.

[*33] Tribune thus did not report the value of the guaranties on its financial statements. It did, however, disclose the guaranties in footnotes within those statements.

XIV.  The Special Distribution

In the final step of the Cubs transaction, CBH transferred cash to Tribune. On the closing date, CBH received the proceeds from the senior debt and sub debt. That day, CBH made a special distribution of $704,872,594 to Tribune. As a result of arbitration between the parties to the Cubs transaction, that amount was later adjusted to $705,672,725.

XV.  The Financial Outcome and Expenses of the Cubs Transaction

Tribune received a total final partnership distribution of $714,350,538.[22] CBH assumed $35,241,562 in liabilities associated with the Cubs assets. On the Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., that CBH

---

[22]The amount of the distribution was subject to several adjustments, and the final amount was not determined until arbitration between the parties to the Cubs transaction in 2011. The initial transfer consisted of $704,872,594 in cash, $8,577,023 in expenses paid by CBH on behalf of Tribune, $197,806 in expected future transfers, and $100,800 in expected future income from the lease and sale of certain real property. CBH and Tribune reported a special distribution of $713,748,223 on their 2009 tax returns. As a result of arbitration, this number was later adjusted to $714,350,538.

[*34] issued to Tribune for 2009, CBH reported Tribune's basis in the transferred assets at the time of transfer as $146,010,336. Petitioners argue, but failed to establish, that its true basis at the time of contribution was $148,544,336 (before taking into account Tribune's transaction expenses).[23]

Tribune incurred $15,293,748 of expenses to form CBH in 2009. This amount consists of (1) $8,577,023 in Cubs expenses, including professional fees and transaction expenses incurred by Tribune and paid by CBH; plus (2) $6,716,725 in additional transaction expenses. Because the Cubs' expenses had been Tribune's expenses, Tribune is deemed to have received a distribution of $8,577,023.

Tribune also paid Mr. Utay $2.5 million to reimburse him for bidding expenses as part of the renegotiation for the Cubs.

XVI. Options

Embedded in the Cubs transaction was an option for Tribune to sell its entire interest in the Cubs. The operating agreement provides an option to Tribune to sell

---

[23]The discrepancy relates to Tribune's basis in CSN Chicago. Petitioners argue that Tribune's basis should be adjusted to take into account the final Schedule K-1 it received from CSN Chicago. If that Schedule K-1 is in the record, they do not cite it, and their internal workpapers are not sufficient to establish their basis.

[*35] and an option to RAC to buy Tribune's remaining 5% interest in the Cubs. The agreement allows RAC to call Tribune's 5% interest any time during 2018 or 2024 and Tribune to put its 5% interest any time during 2021 or 2027. In 2018, RAC exercised its call option. The parties agreed to CBH's fair market value. After determining the net equity value by reducing the gross fair market value by the outstanding debt, RAC paid Tribune $107 million for its 5% interest.

XVII. Standard & Poor's (S&P) Credit Rating

S&P did not rate Tribune while it was in bankruptcy, but it issued a preliminary credit rating for Tribune in 2012, shortly before it emerged from bankruptcy. S&P continued issuing credit ratings for Tribune from 2012 through 2016. In each of its credit rating reports, S&P considered the guaranties and concluded that they were a "significant financial risk" or a "financial risk" to Tribune. S&P assessed Tribune's overall financial risk profile to be "aggressive."

In S&P's 2016 credit rating report of Tribune, it recharacterized "roughly $100 million" of CBH's debt as debt attributable to Tribune as a result of the guaranties. It arrived at $100 million by subtracting the "hypothetical distressed emergence value of the partnership" and the "potential tax benefits" from CBH's "actual debt." The reclassified debt increased S&P's assessment of Tribune's

**[*36]** financial risk, a point explained by Jeanne Shoesmith, who worked on the credit rating report at S&P.

XVIII.     Tax Reporting of the Cubs Transaction

Tribune timely filed its 2009 Form 1120S, U.S. Income Tax Return for an S Corporation.  On its Form 1120S, Tribune reported the Cubs transaction as a disguised sale.  It reported a loss of $190,685,361 and a net long-term capital gain of $33,542,275.  It reported a net built-in gain of $33,830,135 attributable to the Cubs transaction.  And Tribune deducted the $2.5 million it paid to Mr. Utay.

CBH timely filed its Form 1065, U.S. Return of Partnership Income.  CBH reported that its partners contributed $150 million of cash and $730,879,891 of property during the 2009 taxable year.  It also reported that it made a $704,872,594 cash distribution.

On RAC's Schedule K-1, CBH reported that RAC owned a 95% interest in profits and losses and a 93.727294% interest in capital.  The Schedule K-1 showed RAC was allocated nonrecourse liabilities of $116,734,376 and no recourse liabilities.  On Tribune's Schedule K-1, CBH reported a 5% profits and losses interest and a 6.272420% capital interest.  It showed Tribune's allocation of liabilities as nonrecourse liabilities of $6,143,915 and recourse liabilities of

[*37] $673,750,000. The Schedules K-1 show that in 2009, RAC contributed $165,376,486 of capital and Tribune contributed $715,503,405.

XIX.  Examination, Petition, and Trial

The Commissioner examined Tribune's and CBH's 2009 tax returns.  On June 28, 2016, the Commissioner sent Tribune a notice of deficiency for 2009.  In the notice, the Commissioner determined an increased tax liability of $181,661,831 attributable to built-in gains under section 1374 and denied Tribune's $2.5 million deduction of Mr. Utay's negotiation expenses on the basis that these costs should instead be capitalized.

Citing the anti-abuse rules under section 701 and the substance-over-form doctrine, the Commissioner determined that Tribune's guaranties were not valid and that the disguised sale of the Cubs was taxable.  The Commissioner calculated that Tribune realized $739,509,665 of built-in gain on the sale of the Cubs, $705,679,530 more than Tribune reported on its return.

The notice also set forth adjustments to items reported by CBH to Tribune.  It reduced Tribune's reported capital contribution from $715,503,405 to $20 million.  It also reduced Tribune's reported allocable share of recourse liabilities from $673,750,000 to zero.  It then increased Tribune's share of nonrecourse liabilities from $6,143,915 to $27,393,915.

[*38] The Commissioner also determined a 40% gross valuation misstatement penalty of $72,664,732 under section 6662(h) and a 20% accuracy-related penalty under section 6662(a), (b)(1), (2), and (3), (c), (d), and I in the alternative.

On June 28, 2016, the Commissioner sent Northside Entertainment Holdings, LLC (formerly RAC), an FPAA for 2009. Through the FPAA, the Commissioner determined partnership items of CBH, namely, adjustments to income, capital contributions, and disguised sale proceeds. The FPAA also set forth the Commissioner's determinations regarding the nature of CBH's liabilities, reclassifying CBH's sub debt as equity and its senior debt as nonrecourse. The Commissioner then adjusted CBH's recourse liabilities down from $673,750,000 to zero and adjusted its nonrecourse liabilities from $122,878,291 to $547,878,291. The Commissioner also adjusted capital contributions to CBH. The FPAA also set forth a decrease in Tribune's capital contribution from $715,503,405 to $20 million and an increase in RAC's capital contribution from $165,376,486 to $414,176,486. The Commissioner also determined a 40% gross valuation misstatement penalty.

Tribune and Northside Entertainment Holdings, LLC, as tax matters partner of CBH, filed timely petitions with this Court. At that time, the principal place of business of both entities was Chicago, Illinois. The cases were consolidated and set for trial. On December 21, 2018, both sides filed motions for partial summary

[*39] judgment on the penalty-related issues.  In their motions, the parties disputed whether the penalties were properly approved under section 6751(b).  At the time of trial, the Court had not yet ruled on those motions, and factual issues relating to the penalties were not tried.  For the reasons stated in Tribune Media Co. v. Commissioner, T.C. Memo. 2020-2, we granted the Commissioner's motion for partial summary judgment in part, holding that the section 6662(h) penalty was timely approved but that factual questions remained as to whether the remainder were timely approved.  We denied petitioners' cross-motion.

Trial began on October 28, 2019, in Washington, DC.  The Court heard closing arguments on December 11, 2019.

Both sides presented several expert witnesses at trial.  Among petitioners' experts was Ron Kahn, managing director at Lincoln International, LLC, and head of its debt advisory group.  For these cases, Mr. Kahn prepared a rebuttal report to findings of Howard Gellis, an expert hired by the Commissioner.  Mr. Kahn testified that the sub debt's terms were commercially reasonable and that the guaranties served a valid business purpose and had value.  Likewise, William Chambers, an associate professor of finance at Boston University's Metropolitan College, testified that the terms of the sub debt were reasonable.  Professor Shaked also testified on petitioners' behalf.  Professor Shaked is a professor of finance and

[*40] economics at Boston University's Questrom School of Business and the managing director of the Michel-Shaked Group, a firm that provides corporate finance and business consulting to private and public entities. In his report, Professor Shaked analyzed CBH's financial position and concluded that the company was creditworthy and adequately capitalized. Merle Erickson also testified for petitioners. An accounting professor at the University of Chicago Booth School of Business, Professor Erickson provided testimony on the differences between GAAP accounting and tax accounting, specifically regarding Tribune's financial reporting of the guaranties.

The Commissioner also relied on several experts in presenting his case. Among those experts was Mr. Gellis, the former senior managing director of the Blackstone Group. Mr. Gellis analyzed the commercial reasonableness of the sub debt and the guaranties, concluding that neither the guaranties nor the sub debt was commercially reasonable. Dr. Skinner, an accounting professor and faculty dean at the University of Chicago Booth School of Business, also opined on the guaranties and whether they created a material risk for Tribune.

## OPINION

Before entering into the Cubs transaction, Tribune elected subchapter S treatment for Federal income tax purposes. Ordinarily, S corporations are

**[*41]** passthrough entities, which generally are not subject to Federal income tax.[24]

Instead, tax is imposed at the shareholder level.[25] However, there are exceptions to

this rule, one of which applies here.

When a C corporation converts to an S corporation, a corporate-level tax

applies to any net recognized built-in gain during the recognition period.[26] The

recognition period generally extends for 10 years from the date of conversion.[27]

This corporate-level tax applies to transactions treated as completed sales for

Federal income tax purposes.[28]

These subchapter S rules are not in dispute. The Cubs transaction occurred

within 10 years of when Tribune converted from a C corporation to an

S corporation in 2007. Thus, when Tribune completed the Cubs transaction in

2009, it could be taxed on built-in gain at the corporate level. What is in dispute is

---

[24]Sec. 1363(a).

[25]Sec. 1366(a).

[26]Sec. 1374(a).

[27]Sec. 1374(d)(7).

[28]Anschutz Co. v. Commissioner, 135 T.C. 78, 97-98 (2010), aff'd, 664 F.3d 313 (10th Cir. 2011).

[*42] the extent to which Tribune had net recognized built-in gain. The answer to this question turns on the disguised sale rules in subchapter K.

Petitioners argue that the Cubs transaction is a disguised sale but that the distribution to Tribune is not taxable because it was a debt-financed distribution. They claim that the Commissioner erred when he invalidated the guaranties, recharacterized the liabilities, and designated the sub debt as equity.

The Commissioner agrees that the Cubs transaction was structured as a disguised sale, but he argues that the distribution to Tribune is taxable. He claims the guaranties promise repayment in name only, the senior debt is nonrecourse, and the sub debt is not bona fide debt. He argues in the alternative that various doctrines should be applied to recast the Cubs transaction as an outright sale.

We take each issue in turn. First, we discuss whether the sub debt is bona fide debt or equity for Federal income tax purposes. Second, we address whether the senior debt guaranty is sufficient to render the senior debt recourse as to Tribune. Lastly, we consider the applicability of various nonstatutory rules to determine whether the guaranties should be disregarded for Federal income tax purposes.

**[\*43]** I.     <u>Jurisdiction and Burden of Proof</u>

Tribune asks us to determine that no deficiency or addition to tax is due. CBH asks us to determine that the Commissioner erred in making the adjustments set forth in the FPAA. The Commissioner asks that we uphold his deficiency determination as to Tribune and his adjustments as to CBH.

We are a court of limited jurisdiction, which we may exercise only over the matters Congress has expressly authorized us to consider.[29] We have jurisdiction to redetermine a deficiency and any addition to tax when the Commissioner mails a valid notice of deficiency and the taxpayer timely files a petition with our court.[30] We have jurisdiction to determine all partnership items and the applicability of any penalty when, as here, the tax matters partner files a petition for readjustment of such items within 90 days of the mailing of a valid FPAA by the Commissioner.[31] We have jurisdiction over this matter.

Generally, the Commissioner's determinations in a notice of deficiency or an FPAA are presumed correct, and the taxpayer bears the burden of showing

---

[29]Sec. 7442; <u>Estate of Young v. Commissioner</u>, 81 T.C. 879, 880-881 (1983).

[30]Secs. 6212, 6213, and 6214; Rule 13.

[31]Sec. 6226(a)(1), (f).

**[*44]** otherwise.[32]  Neither party alleges that we should shift the burden of proof,

nor do the facts support shifting it.  Therefore, the burden is on petitioners.

The principal place of business of both Tribune and CBH was Chicago,

Illinois, when they filed their respective petitions.  Thus, these cases are appealable

to the U.S. Court of Appeals for the Seventh Circuit.[33]  When it is controlling, we

follow precedent set by the Seventh Circuit.[34]

II.    Disguised Sale Overview

Before embarking on a technical discussion of the disguised sale rules, it

would perhaps be helpful to discuss them conceptually.

A starting point is to understand how a person might monetize a piece of

property.  If a person sells property for cash, that person must recognize gain to the

extent the sale price exceeds the basis in the property.[35]  Instead, that same person

---

[32]Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[33]Sec. 7482(b)(1).

[34]Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

[35]Secs. 61(a)(3), 1001(a), (c).

**[*45]** could monetize that same piece of property by taking out a loan, perhaps secured by the property. The loan proceeds would not be taxed.[36]

Suppose instead of selling property for cash, a person contributes the property to a partnership in exchange for a partnership interest. The contribution is not a taxable event, and the contributing partner's basis in the partnership interest is generally equal to the basis in the property at the time of contribution.[37] Under normative rules, if that partner receives a distribution of cash from the partnership in excess of the basis of the property at the time of contribution, that excess distribution would be income.[38] But economically, the transaction looks a lot like a sale: Property is transferred and cash is received. This is a disguised sale, and the Code and the regulations set forth rules on how to calculate the gain, if any.[39]

We can apply these same basic principles to a situation in which a person borrows against property before contributing it. We've already established that a person can borrow against property and the loan proceeds are generally not

---

[36]Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

[37]Secs. 721(a), 722.

[38]Sec. 731(a)(1).

[39]Sec. 707(a)(2)(B); sec. 1.707-3, Income Tax Regs.

**[*46]** taxable. And we've already established that contributing property to a partnership is not a taxable event. If we combine those two transactions, a person could borrow against the property and then contribute the property to the partnership while retaining the loan proceeds and remaining liable on the loan. There would be no tax on that series of transactions. The contributing partner would have the loan proceeds in hand, be liable for repayment of the loan, and own a partnership interest with a basis equal to the basis of the property at the time of contribution.

Suppose instead of borrowing before contributing the property to the partnership, the person contributes the property and the partnership takes out the loan. The tax results follow the same basic rules we've already outlined. The person contributes the property, taking a basis in the partnership interest equal to the basis in the property at the time of contribution. The partnership takes out a loan, and the partnership distributes cash to the contributing partner. As discussed above, this is a disguised sale, and the contributing partner will be taxed on the distribution under the disguised sale rules.

But what if the contributing partner is personally liable on that loan? Assuming responsibility for that liability would result in an increase to the

[*47] contributing partner's basis.[40] As a result, that partner could receive a greater tax-free distribution because the partner's basis includes the combination of the basis in the property at the time of contribution plus the amount of the liability assumed by the contributing partner. This relatively straightforward example is the debt-financed distribution exception to the disguised sale rule.[41]

But for the debt-financed distribution exception to apply, the debt must be bona fide debt, and the contributing partner must, in fact, have assumed or guaranteed the liability. Those are the issues we are asked to address in these cases.

## III. The Cubs Transaction: A Disguised Sale

The Cubs transaction arose from Tribune's desire to dispose of the Cubs assets, to focus on its core businesses, and to obtain cash to pay off other debts. However, the Cubs assets had significantly appreciated, and an outright sale would have generated considerable gain recognition.[42] To maximize its after-tax

---

[40]Sec. 752(a).

[41]See sec. 1.707-5(b)(1), Income Tax Regs.

[42]See secs. 61(a)(3), 1001.

[*48] proceeds, Tribune sought to structure the disposition of the Cubs assets in a tax-favored way.

Tribune intentionally structured the disposition of the Cubs assets to fit into an exception to the disguised sale rule that would allow for nonrecognition of gain from the special distribution. Tribune contributed the Cubs assets to a newly formed partnership, CBH, in exchange for a 5% interest. CBH borrowed money and Tribune guaranteed collection of the debt. Then, CBH made the special distribution to Tribune as part of the transaction. Finally, Tribune reported the transaction on its 2009 return as a disguised sale. Tribune intended to limit its recognized gain to the proceeds that exceeded the debt-financed distribution. The Commissioner does not dispute that the Cubs transaction was structured as a disguised sale; rather, he takes issue with the debt-financed distribution portion of the transaction. He argues that the sub debt and the guaranties were not bona fide.

A transaction structure driven by tax planning is not an inherently dubious structure. As Judge Learned Hand famously explained: "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to

[*49] increase one's taxes."[43]  Consistent with Judge Hand's adage, Tribune sought to arrange its transaction as to minimize its taxes.

A.    Disguised Sales Rules

A disguised sale occurs when a partner transfers property into a partnership and that partner receives cash or property in return in such a way to render the transaction a sale.  Section 707(a)(2)(B) provides:

> If--
>
> (i) there is a direct or indirect transfer of money or other property by a partner to a partnership,
>
> (ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and
>
> (iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property, such transfers shall be treated * * * [as between the partner acting other than in his capacity as a member of such partnership and the partnership.]

The result of this provision is to revoke the nonrecognition treatment for transactions between a partner and a partnership and to treat the transaction as a taxable sale of property between unrelated parties.  Congress passed section 707

---

[43]Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934), aff'd, 293 U.S. 465 (1935).

[*50] out of concern that taxpayers were inappropriately deferring gain on transactions that were actually sales of property by structuring the transactions as partnership contributions and distributions.[44]

The disguised sale rules distinguish between taxable and nontaxable dispositions of property involving a partnership. When a taxpayer disposes of property through a sale, the sale may generate taxable income, especially in the case of appreciated property.[45] However, if instead of selling the property, the taxpayer disposes of the same property by contributing it to a partnership in exchange for an interest in the partnership, the transaction is generally tax-free.[46] The potential for abuse occurs when a partner assumes the role of a third-party seller, allowing the "de facto sales of property to a partnership or another partner"

---

[44]H.R. Rept. No. 98-432 (Part 2), at 1218 (1984), 1984 U.S.C.C.A.N. 697, 884; see also Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (General Explanation), at 226 (J. Comm. Print 1985).

[45]Sec. 1001.

[46]See sec. 721(a).

**[*51]** by structuring the transaction as "a contribution to the partnership, followed (or preceded) by a tax-free distribution from the partnership."[47]

Generally, a partner who contributes property to a partnership will receive nonrecognition treatment, while a partner who sells property to a partnership must recognize any gain on that sale. Congress provides nonrecognition of gains on contributions to and distributions from a partnership to promote the free flow of capital between a partner and the partnership; these transfers reflect a mere change in the form of the investment, rather than a cashing-out and realization of the income from that investment.[48] However, when a transaction is in reality the cashing out of an investment, the policy rationale behind tax-free treatment no longer applies.

The regulations promulgated under section 707(a)(2)(B) attempt to clarify when a transfer between a partnership and its partner more closely reflects a sale

---

[47]General Explanation, supra note 44, at 225; see also H.R. Rept. No. 98-432 (Part 2), supra at 1218, 1984 U.S.C.C.A.N. at 883. Generally, a partner does not recognize gain when the partnership distributes property to the partner except to the extent such distribution exceeds their basis in their partnership interest. Sec. 731(a)(1).

[48]See, e.g., Eisner v. Macomber, 252 U.S. 189, 212-213 (1920); General Explanation at 242; Thomas W. Henning, "Partnership Exit Strategies and the Failure of the Substantiality Test", 63 Tax Law. 43, 97 (2009).

[*52] rather than a contribution and distribution. Congress specifically instructed that the Secretary "should be mindful that the Committee is concerned with transactions that attempt to disguise a sale of property and not with non-abusive transactions that reflect the various economic contributions of the partners."[49] The regulations state that whether a transaction is treated as a disguised sale depends on whether:

> based on all the facts and circumstances--
>
> (i) The transfer of money or other consideration would not have been made but for the transfer of property; and
>
> (ii) In cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations.[50]

The regulations list factors that may assist in making the determination.[51]

### B. The Debt-Financed Distribution Exception

There are exceptions to the disguised sale rules, including the debt-financed distribution rule. The debt-financed distribution rule permits a partner to receive a

---

[49]H.R. Rept. No. 98-432 (Part 2), supra at 1220, 1984 U.S.C.C.A.N. at 886; see also General Explanation at 231.

[50]Sec. 1.707-3(b)(1), Income Tax Regs.

[51]Sec. 1.707-3(b)(2), Income Tax Regs.

[*53] debt-financed distribution of property from a partnership as part of a disguised sale tax free up to the amount of debt allocated to that partner.[52] To invoke the debt-financed distribution rule, the partner must "retain substantive liability for repayment" of the debt, meaning it must be allocated the partnership liability.[53] Tribune argues that it should be allocated the debt because it bears the economic risk of loss on account of its guaranties. The Commissioner says the possibility of Tribune's being called on to fulfill the guaranties is so remote that they should be disregarded.

Section 1.707-5(b)(1), Income Tax Regs., sets forth the rule Tribune relies on to exclude the amount of debt-financed gain:

> [I]f a partner transfers property to a partnership, and the partnership incurs a liability and all or a portion of the proceeds of that liability are allocable * * * to a transfer of money or other consideration to the partner made within 90 days of incurring the liability, the transfer of money or other consideration to the partner is taken into account only

---

[52]Sec. 1.707-5(b)(1), Income Tax Regs.

[53]General Explanation at 232. Notably, the same Act instructed the Secretary to prescribe regulations relating to the treatment of guaranties. Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 79, 98 Stat. at 597. And in its conference report, Congress instructed that those regulations should "take into account, where possible, the manner in which the partners share the economic risk of loss with respect to the borrowed amounts." H.R. Conf. Rept. No. 98-861, at 868 (1984), 1984-3 C.B. (Vol. 2) 1, 122.

**[\*54]** to the extent that the amount of money \* \* \* transferred exceeds that partner's allocable share of the partnership liability.

Under the debt-financed distribution rule, a partner's allocable share of a partnership liability is its share of the liability under normal rules for allocation of partnership liabilities, multiplied by the percentage of the liability used to fund the distribution.[54] The allocation of partnership liabilities among partners depends on whether the liability is a recourse liability or a nonrecourse liability.[55] A recourse liability is a liability for which "any partner or related person bears the economic risk of loss."[56] A nonrecourse liability is one for which "no partner or related person bears the economic risk of loss."[57]

Whether a transaction is abusive can depend on whether a partner bears the economic risk of loss. In attempting to distinguish between abusive and nonabusive transactions, Congress recognized that debt frequently plays a valid role in both sale and business formation transactions and thus did not intend to

---

[54]Sec. 1.707-5(b)(2), Income Tax Regs.

[55]Sec. 1.707-5(a)(2), Income Tax Regs.

[56]Sec. 1.752-1(a)(1), Income Tax Regs.

[57]Sec. 1.752-1(a)(2), Income Tax Regs.

[*55] limit its legitimate use.  The report of the Joint Committee on Taxation

explains that a nonabusive use of debt occurs when

> a partner contributes property to a partnership and that property is
> borrowed against, pledged as collateral for a loan, or otherwise
> refinanced, and the proceeds of the loan are distributed to the
> contributing partner, there is not a disguised sale to the extent the
> distributed proceeds are attributable to indebtedness properly
> allocable to the contributing partner under the rules of section 752
> (i.e., to the extent the contributing partner is considered to retain
> substantive liability for repayment of the borrowed amounts), since, in
> effect, the partner in this case has simply borrowed through the
> partnership. * * * [58]

In contrast, an abusive situation occurs when:

> the transferor partner receives the proceeds of a loan related to the
> property and responsibility for the repayment of the loan rests,
> directly or indirectly, with the partnership (or its assets) or the other
> partners.[59]

Essentially, the distinction is whether the contributing partner is still economically

liable for the debt.

The parties do not dispute that the special distribution was a debt-financed

distribution; but they dispute how much debt is properly allocated to Tribune for

the purpose of applying this rule.  Tribune argues it is entitled to offset any gain

---

[58]General Explanation at 232.

[59]General Explanation at 232.

**[*56]** recognized on the Cubs transaction by $673,750,000, the amount of the senior debt and sub debt combined.  It says it bore the economic risk of loss for those debts through the guaranties.  The Commissioner disagrees.  First, he argues that the sub debt was not bona fide debt; he argues it was a disguised equity contribution.  Second, he argues that Tribune's guaranties of the senior debt and sub debt did not have economic substance such that Tribune was responsible for repayment of the debts.

IV.  The Sub Debt:  Bona Fide Debt or Equity

The parties dispute whether the $248,750,000 of sub debt CBH borrowed from RAC Finance was bona fide debt.  Petitioners argue that the sub debt was bona fide debt and therefore a partnership liability of CBH.  The Commissioner disagrees, saying the sub debt was actually additional equity invested by the Ricketts family.  If the sub debt is not bona fide debt, then it could not be allocated to Tribune to increase its basis in CBH.  And Tribune's recognized gain from the Cubs transaction could not be reduced by its share of the sub debt liability.

A.  Factors To Determine Debt or Equity

In determining whether an advance is debt or equity we consider 13 factors outlined in Dixie Dairies Corp.:

the names given to the certificates evidencing the indebtedness;
presence or absence of a fixed maturity date; source of payments;

**[*57]** right to enforce payments; participation in management as a result of the advances; status of the advances in relation to regular corporate creditors; intent of the parties; identity of interest between creditor and stockholder; "thinness" of capital structure in relation to debt; ability of corporation to obtain credit from outside sources; use to which advances were put; failure of debtor to repay; and risk involved in making advances.[60]

We do not weight the factors equally but consider each of them in the context of the cases before us.[61] They are intended to help us answer "whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the * * * [business] venture or represents a strict debtor-creditor relationship."[62]

The Court of Appeals for the Seventh Circuit has not yet reviewed, approved, or modified our use of the Dixie Dairies factors. However, it has reviewed questions of whether advances were debt or equity; and when doing so it has cited with approval many of the cases we relied upon to develop the Dixie

---

[60]Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

[61]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493-494.

[62]Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).

[*58] <u>Dairies</u> factors.[63]  In that Court of Appeals, whether an advance is debt or equity is a question of fact.[64]

     B.     <u>Evaluation of the Dixie Dairies Factors</u>

          1.     <u>The Names Given to the Certificates Evidencing the Indebtedness</u>

The first factor asks us to consider "the names given to the certificates evidencing the indebtedness."[65]  If the parties use a stock certificate, this factor weighs towards equity, but the use of a bond, debenture, or note indicates debt.[66]  When the instrument is a promissory note, this factor suggests debt.[67]  However, the label placed on an advance is less informative when the same parties control

---

[63]See, e.g., <u>Burr Oaks Corp. v. Commissioner</u>, 365 F.2d 24, 27 (7th Cir. 1966), <u>aff'g</u> 43 T.C. 635 (1965); <u>Sherwood Mem'l Gardens, Inc. v. Commissioner</u>, 350 F.2d 225, 228-229 (7th Cir. 1965), <u>aff'g</u> 42 T.C. 211 (1964); <u>Milwaukee & Suburban Transp. Corp. v. Commissioner</u>, 283 F.2d 279, 282 (7th Cir. 1960), <u>rev'g in part on other grounds</u> T.C. Memo 1959-216, <u>vacated and remanded</u>, 367 U.S. 906 (1961).

[64]<u>Portage Plastics Co. v. United States</u>, 470 F.2d 308, 312 (7th Cir. 1972).

[65]<u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493.

[66]<u>Estate of Mixon v. United States</u>, 464 F.2d 394, 403 (5th Cir. 1972).

[67]See <u>Estate of Mixon</u>, 464 F.2d. at 403; <u>NA Gen. P'ship & Subs. v. Commissioner</u>, T.C. Memo. 2012-172, 103 T.C.M. (CCH) 1916, 1919 (2012); <u>Am. Underwriters, Inc. v. Commissioner</u>, T.C. Memo. 1996-548, 72 T.C.M. (CCH) 1511, 1515 (1996).

**[\*59]** both sides of a transaction because "the parties may mold it at their will" and the "[l]abels * * * thus lose their meaningfulness."[68]

The sub debt was evidenced by a sub debt note. Petitioners argue this factor weighs in favor of debt because the sub debt was evidenced by a note. They also observe that the sub debt was consistently called debt in transaction documents, in the private placement memorandum, and in various investor presentations.

The Commissioner concedes that the sub debt was consistently labeled debt. But he argues that this factor has low probative value in our overall analysis because the parties to the sub debt are related.

This factor favors debt but has low probative value. The advance was labeled debt. The parties involved in the transaction consistently called the sub debt "debt." However, the Ricketts family controlled both the lender and borrower and did not negotiate at arm's length. They could label the advance as they desired.

---

[68]Fin Hay Realty Co., 398 F.2d at 697.

**[\*60]**  2.  The Presence or Absence of a Fixed Maturity Date

The second factor is the "presence or absence of a fixed maturity date."[69] "The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same on the other hand would indicate that repayment was in some way tied to the fortunes of the business, indicative of an equity advance."[70] A fixed maturity date is one "without reservation or condition."[71] This factor weighs heavily in our analysis; without a provision that "the holder may unconditionally demand his advance at a fixed time" the advance cannot be a debt.[72]

The parties dispute whether the sub debt had a fixed maturity. Petitioners observe that the sub debt had a stated maturity of 15 years. But the Commissioner counters that the subordination agreement allowed the senior debt lenders to effectively extend the maturity date of the sub debt indefinitely.

---

[69]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[70]Estate of Mixon, 464 F.2d at 404.

[71]Monon R.R. v. Commissioner, 55 T.C. 345, 359 (1970).

[72]PepsiCo P.R., Inc. v. Commissioner, T.C. Memo. 2012-269, at \*58 (citing Jewel Tea Co. v. United States, 90 F.2d 451, 453 (2d Cir. 1937)).

[*61] The maturity of the sub debt, according to the note evidencing it, is 15 years. But the sub debt is subject to the provisions of several other agreements that could override the maturity date. At trial, Mr. Gellis opined that this 15-year maturity was not really fixed. He explained that because the sub debt could not be repaid before the senior debt, the actual maturity date hinged on payment of the senior debt. And because the senior debt lenders could extend the maturity of the senior debt, the senior debt holders effectively could extend the maturity of the sub debt indefinitely. The subordination agreement supports Mr. Gellis' interpretation.

If a genuine possibility exists that the stated maturity date is flexible, then the date is not fixed. We considered the fixed maturity date factor in detail in PepsiCo P.R., Inc.[73] The advances in that case matured in 40 years with a unilateral option for the holders to extend that date for 15 years.[74] Additionally, if a related party defaulted on loans owed to the taxpayers in that case, the terms of the advances became perpetual.[75] The taxpayers argued, in part, that the possibility

---

[73]PepsiCo P.R., Inc. v. Commissioner, T.C. Memo. 2012-269.

[74]PepsiCo P.R., Inc. v. Commissioner, at *58.

[75]PepsiCo P.R., Inc. v. Commissioner, at *58.

[*62] of the advances' terms becoming perpetual rendered them equity.[76] The Commissioner disagreed saying the advances had a fixed maturity date indicative of debt and dismissed the possibility that the maturity would become perpetual, arguing that the taxpayers would never allow its related entities to default on their notes.[77] We held that the notes lacked a fixed maturity date, noting in part, that the related-party default could occur, making the terms perpetual.[78] We therefore held that the factor favored equity.[79]

It is clear that the maturity date here is subject to reservations and conditions. The maturity date can be deferred if CBH fails to timely pay the senior debt. It can also be deferred if the senior debt lenders choose to alter the payment date or other conditions of the senior debt, which they may do "at any time." Similar conditions tying maturity of the subject loan to repayment of other loans indicated equity in PepsiCo. As in PepsiCo, the condition that must be met before the subject loan reaches maturity is not certain to occur. Whether CBH would pay

---

[76]PepsiCo P.R., Inc. v. Commissioner, at *58.

[77]PepsiCo P.R., Inc. v. Commissioner, at *59.

[78]PepsiCo P.R., Inc. v. Commissioner, at *65-*66.

[79]PepsiCo P.R., Inc. v. Commissioner, at *66.

[*63] the senior debt in full within 15 years of the sub debt closing date was unknown when the note was signed. Therefore, the maturity date was subject to reservations and conditions that render it not fixed. The lack of a fixed maturity date indicates equity.

### 3. The Source of the Payments

The third factor is the "source of payments."[80] If repayment does not depend on corporate earnings, this factor leans toward debt.[81] However, the advance is likely equity if "repayment depends on earnings or is to come from a restricted source."[82]

Repayment of the sub debt came from the cash waterfall. The sub debt note provides that the borrower is only permitted to pay interest if there is cash available in the cash waterfall and the payment is allowed under the requisite agreements. If enough cash did not flow through the waterfall to fund the interest payments, the payments would not be made and the unpaid interest would be added to principal.

---

[80]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[81]Estate of Mixon, 464 F.2d at 405.

[82]NA Gen. P'ship & Subs. v. Commissioner, 103 T.C.M. (CCH) at 1920.

**[\*64]**  Petitioners, citing <u>NA Gen. P'ship & Subs.</u>, describe this factor as a consideration of "whether the borrower's cash flows were reasonably anticipated to be sufficient to service the debt."[83]  Petitioners argue this factor supports a finding of debt because both petitioners' and the Commissioner's experts concluded that CBH's cashflow would most likely enable it to pay its debts as they came due.  The Commissioner argues that the test is not whether CBH could pay the interest but from which funds it would make the payments.  He says that because CBH can pay only if specific funds are available, repayment is tied to the success of the business and this factor favors equity.

It is clear that the making of interest payments depended on CBH's earnings. Both parties' experts concluded that CBH had sufficient cashflow to timely service its debts, including interest payments on the sub debt.  But this factor tests whether repayment depends on the business' earnings or comes from a restricted source, not whether that source is expected to have sufficient funds to make repayment. Through the cash waterfall, CBH's revenue streams were carefully controlled to limit what revenue could be used to pay which expenses.  Furthermore, although

---

[83]See <u>NA Gen. P'ship & Subs. v. Commissioner</u>, 103 T.C.M. (CCH) at 1920.

**[*65]** repayment was likely, it was not certain. Risks existed that could cause the revenue stream to dry up. For example, revenue is highly dependent on actual attendance at baseball games. If the Cubs did not perform well during a season, or other conditions caused a significant drop in attendance, revenue could diminish to the point that payments on the sub debt could not be made. This is especially true because the sub debt interest was the last payment obligation in the cash waterfall. So if revenue sufficiently decreased, the sub debt interest payments would be the first payment to stop flowing.

Although the making of interest payments depended on earnings, the ultimate repayment of principal did not. If the debtor's repayment is contingent upon earnings or is from a restricted source, such as a judgment recovery, dividends, or profits, the advance resembles equity.[84] "When circumstances make it impossible to estimate when an advance will be repaid because repayment is contingent upon future profits or repayment is subject to a condition precedent, or

---

[84]Flint Indus., Inc. & Subs. v. Commissioner, T.C. Memo. 2001-276, 82 T.C.M. (CCH) 778, 787 (2001).

[*66] where a condition may terminate or suspend the obligation to repay, an equity investment is indicated."[85]

The sub debt note does not require CBH to repay principal out of profits or otherwise designate a source of payment. Neither does it provide CBH the option of delaying repayment until it has sufficient profits to pay in full. CBH was expected to repay the sub debt when it came due, regardless of its revenue. This indicates that the source of repayment of the principal was not limited to profits or another specified source and the obligation to repay was not tied to the profitability of CBH. The Commissioner argues that because repayment of the sub debt principal was conditioned on repayment of the senior debt, the payments showed "unusual flexibility." While it is true that repayment of the sub debt is contingent on repayment of the senior debt, this lower status is an inherent feature of subordinated debt. And we will not conclude subordinate debt is equity merely because of its subordination.

The required payments here are bifurcated. Tribune must pay interest payments out of whatever profits remain in the cash waterfall, but ultimately its

---

[85]Flint Indus., Inc. & Subs. v. Commissioner, 82 T.C.M. (CCH) at 787.

[*67] repayment of the sub debt is not restricted or tied to the profitability of CBH. We therefore find this factor to be neutral.

### 4. The Right To Enforce Payment

The fourth factor is the "right to enforce payments."[86] A definite obligation to repay indicates debt,[87] but an instrument that does not "provide its holder with any means to ensure payment" indicates equity.[88] This factor is critical, as "[t]he right to enforce the payment of interest is one of the requisites of a genuine indebtedness."[89]

Petitioners assert that RAC Finance had the right to enforce payment of the sub debt upon maturity or default, so this factor supports debt treatment. They explain that "consistent with the purpose of a subordination agreement" RAC Finance can enforce payment of the sub debt after CBH has paid the senior debt. They concede that these enforcement rights exist only after payment of the senior

---

[86]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[87]NA Gen. P'ship & Subs. v. Commissioner, 103 T.C.M. (CCH) at 1920.

[88]PepsiCo P.R., Inc. v. Commissioner, at *77.

[89]Gokey Props., Inc. v. Commissioner, 34 T.C. 829, 835 (1960), aff'd, 290 F.2d 870 (2d Cir. 1961).

**[*68]** debt, but petitioners ultimately argue that these subordination provisions are common debt terms.

The Commissioner argues that the subordination provisions are so extensive that they render any stated enforcement rights as meaningless. He concludes that this factor favors equity.

This factor weighs strongly toward equity. The right of a holder to enforce timely payment of amounts due is an essential characteristic of debt. RAC Finance has no meaningful right to enforce interest payments as they come due. Its ability to enforce payments of the sub debt is limited both by the sub debt note and the subordination agreement. RAC Finance has no mechanism to require or enforce CBH's interest payments if the cash waterfall lacks sufficient funds. And while the sub debt note itself prevents enforcement of interest payments, the subordination agreement provides additional restrictions on the holder of the sub debt, even when the principal is due. Furthermore, the right to enforce repayment of principal can become meaningful only after full payment of the senior debt. RAC Finance's right of enforcement is not present here.

**[\*69]** Petitioners cite Green Bay Structural Steel, Inc. for the proposition that this Court does not condemn subordination.[90] But the holders of the Green Bay subordinated debt had rights not available to RAC Finance. In Green Bay, we held that the subordinated debt was bona fide.[91] But that debt instrument included provisions "to assure investors a means to enforce payment should a default occur."[92] Nonpayment of interest that continued for 30 days was an event of default.[93] While lenders of the more senior debts could accelerate payment upon default of the subordinated debt, the subordinated debt holders also could exercise remedies and trigger acceleration.[94] That is not the case with CBH's sub debt.

Further, while not every subordinated instrument is equity, subordination generally favors equity.[95] Petitioners' argument that these subordination

---

[90]Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. 451 (1969).

[91]Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. at 458.

[92]Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. at 455.

[93]Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. at 454.

[94]Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. at 453.

[95]Am. Underwriters, Inc. v. Commissioner, 72 T.C.M. (CCH) at 1516-1517 ("Subordination of purported debt to the claims of other creditors points towards equity. * * * The fact that an obligation to repay is subordinate to claims of other

**[*70]** provisions are common does not change the underlying principle that the more repayment is subordinated, the more it looks like equity. And in this regard, CBH's sub debt looks very much like equity.

    5.    <u>Participation Rights</u>

The fifth factor is whether the holder of the instrument enjoys "participation in management as a result of the advances."[96] When an instrument does not confer voting rights or other management rights on the holder, it suggests debt.[97] But when as a result of the advance the holder gets increased participation rights, equity is indicated.[98] If the holder's rights to manage cannot increase because management is already consolidated, we treat the factor as neutral.[99]

---

creditors, however, does not necessarily mean that the purported debt is really equity.").

[96]<u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493.

[97]<u>Monon R.R. v. Commissioner</u>, 55 T.C. at 359.

[98]<u>Am. Offshore, Inc. v. Commissioner</u>, 97 T.C. 579, 603 (1991).

[99]<u>Am. Offshore, Inc. v. Commissioner</u>, 97 T.C. at 603; <u>PepsiCo P.R., Inc. v. Commissioner</u>, at *84; <u>NA Gen. P'ship & Subs. v. Commissioner</u>, 103 T.C.M. (CCH) at 1920. <u>Compare</u> <u>Am. Underwriters, Inc. v. Commissioner</u>, 72 T.C.M. (CCH) at 1516 (holding the factor favors debt because the entities were commonly controlled), <u>with</u> <u>Slappey Drive Indus. Park v. United States</u>, 561 F.2d 572, 585 n.23 (5th Cir. 1977) ("The lenders already controlled corporate management; that they derived no more control as a result of the ostensible loans does not cut against the equity classification.").

[*71] Petitioners argue that because RAC Finance lacks voting rights or management rights in CBH, this factor favors debt. The Commissioner argues that the sub debt grants management rights because the lender is the mother of the borrower and "[i]t is hard to envision a situation where Marlene Ricketts takes a position that is contrary to her son, Thomas Ricketts." Another reason the Commissioner argues the sub debt carries management rights is that the sub debt is "stapled" to the Ricketts family's controlling equity interest. The Commissioner cites Mr. Gellis' testimony, in which Mr. Gellis opined that the sub debt was "stapled equity, just a piece of paper stapled onto the common equity as a bifurcated strip of equity."

The sub debt note provides no management rights to the holder and does not otherwise affect CBH's management provisions. Both before and immediately after the issuance of the sub debt, the board of CBH consisted of one director appointed by Tribune, and four appointed by RAC. While RAC Finance never had an ownership interest or management rights in CBH, it was managed by RAC, which already had management and participation rights in CBH. The terms of the sub debt also conferred upon its holders privileges, such as private access to Wrigley Field, priority parking, hospitality benefits, and complimentary premium seating, which are typically granted to equity owners.

**[*72]** This factor is neutral, indicating neither debt nor equity, because control of CBH and RAC Finance was common and unchanged by the issuance of the sub debt. RAC controlled management of CBH and RAC Finance both before and after issuance of the sub debt. That the parties chose to lend the money through RAC Finance, a company managed by RAC, does not lead to a management result different from that if the money had come from RAC.

### 6. Status Compared to Other Creditors

The sixth factor is the "status of the advances in relation to regular corporate creditors."[100] Subordinating repayment of the advance to other creditors generally suggests equity.[101] But the fact that an advance is subordinate to other debts does not necessarily mean it is equity, especially if the advance has a claim superior to those of shareholders.[102] This factor is of "some import."[103]

---

[100]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[101]NA Gen. P'ship & Subs. v. Commissioner, 103 T.C.M. (CCH) at 1920.

[102]Estate of Mixon, 464 F.2d at 406.

[103]Estate of Mixon, 464 F.2d at 406.

[*73] Petitioners argue that this factor favors debt simply because the sub debt ranks pari passu (on equal footing) with CBH's obligations to other unsecured creditors and superior to its obligations to its equity holders.

The Commissioner argues the factor favors equity because the sub debt was "far below" the senior debt. He reiterates that the subordination agreement limits the rights of the sub debt holders and concludes it looks like equity. An expert hired by the Commissioner expanded on this. Mr. Gellis testified that, although the sub debt began as pari passu with the trade creditors, if CBH were ever in default, the trade creditors would require the sub debt to be ranked below their debt. He explained that this request would stem from the Ricketts family's ownership of both the sub debt and equity. Mr. Gellis believed that the relationship with the trade creditors' debt and the weak position of the sub debt holders under the subordination agreement rendered the sub debt "even closer to the equity than it looked to be on its face initially."

This factor is neutral. We are not persuaded by either party's arguments. The sub debt is positioned so closely between debt and equity that its position is not illuminating.

**[*74]**     7.     <u>Intent of the Parties</u>

The seventh factor is the "intent of the parties."[104]  The intent of the parties gets at the larger question of the <u>Dixie Dairies</u> factors:  "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?"[105]  To discover the intention to create debt or equity, we look at the "parties' mutual intent to create a debtor-creditor relationship."[106]  Intent is reflected by the actions of the parties to the advance and how they treat the relevant documents and agreements.[107]  This is an important factor.[108]

Petitioners argue that the parties to the advance intended for the sub debt to be debt.  They point to their consistent labeling of the sub debt as debt on financial statements, tax returns, correspondence, and representations to third parties.  Petitioners make significant note of Tribune's and RAC's treatment of the sub debt

---

[104]<u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493.

[105]<u>Litton Bus. Sys., Inc. v. Commissioner</u>, 61 T.C. 367, 377 (1973).

[106]<u>Yaryan v. Commissioner</u>, T.C. Memo. 2018-129, at *38-*39.

[107]<u>PepsiCo P.R., Inc. v. Commissioner</u>, at *88.

[108]<u>Laidlaw Transp., Inc. v. Commissioner</u>, T.C. Memo. 1998-232, 75 T.C.M. (CCH) 2598, 2620 (1998).

[*75] as debt during their contentious negotiations over Tribune's sale to RAC of its 5% interest.

The Commissioner claims that this factor clearly favors equity. He observes that there is a disparity between the partners' stated percentage interests in CBH and their capital interests. He further argues that the sub debt was treated as equity. He also points out that the sub debt was not universally viewed as debt, claiming that both the senior debt lenders and the MLB considered the sub debt equity.

This factor indicates equity. While the parties wanted the sub debt to have the appearance of debt for tax purposes, they intended the sub debt to function economically as equity. The sub debt needed to give the impression of debt for Tribune to achieve its desired tax outcome. And it is clear that Tribune made consistent payments according to the terms of the sub debt. But despite petitioners' contentions otherwise, the true function of the sub debt was that of an equity investment.

The sub debt's actual economic purpose is reflected in the private placement memorandum. The memorandum labeled the sub debt "debt" but described it as equity. It emphasized the inherent risks involved in buying pieces of the sub debt, including CBH's "ability" to pay (rather than its obligation) and the possibility that

[*76] investors could suffer a "complete loss on their investment." The memorandum also underscored that investors could avail themselves of privileges--priority parking, box seats, private use of Wrigley Field--typically afforded to team owners, and it offered the potential buyers a right of first refusal on any future sales of Cubs equity. So while the Ricketts family was ostensibly selling debt, it marketed the opportunity as an equity investment.

The parties structured CBH so that the sub debt functioned economically as equity. At first glance, it appears that CBH included separate profits and capital interests. The percentage interests granted to the partners do not match the capital initially allocated to the partners. Under CBH's operating agreement, RAC held a 95% interest and Tribune held a 5% interest. However, the partners' capital contributions of $150 million for RAC and $20,986,843 for Tribune amount to 87.726% and 12.274% respective ownership interests. But if the sub debt is included as capital, the ownership interests actually amount to 95% for RAC and 5% for Tribune.

[*77]

| Member | Percentage interest | Capital allocated | Capital interest | Capital allocated with sub debt | Percent interest including sub debt |
|---|---|---|---|---|---|
| RAC | 95% | $150,000,000 | 87.726% | $398,750,000 | 94.999% |
| Tribune | 5% | 20,986,843 | 12.274% | 20,986,843 | 5.000% |
| Total | 100% | 170,986,843 | 100% | 419,736,843 | 100% |

It is clear that when the $248,750,000 of sub debt was treated economically as equity, the stated interest and the capital interest align at 95% and 5%.

Further evidence of the partners' intent lies in RAC's exercise of its call option. When RAC exercised the option to buy out Tribune, Tribune and RAC negotiated a gross enterprise value, less the senior and sub debts, and multiplied by 5%, to determine the purchase price.

If Tribune had truly held a 12.274% interest in the capital of CBH, presumably it would have been entitled to 12.274% of the value of CBH's capital interest, instead of just 5%.

Petitioners make much ado about a partner's right to negotiate an ownership interest in an LLC that does not correspond to its economic contributions. But petitioners miss the point. The parties' "equity" contributions amounting to a different split from the 95% and 5% allocated interest is not a concern. But when

**[*78]** the sub debt is added as equity to RAC's contribution, creating the 95% and 5% split, it appears that the partners treated the sub debt economically as equity. This alignment is not a coincidence; it reflects the parties' mutual intent to create equity.

### 8. Identity of Interest

The eighth factor is the "identity of interest between creditor and stockholder."[109] When the creditor and stockholder are the same, we scrutinize the advance more closely; but an identity of interest does not preclude debt treatment.[110] When shareholders advance funds to a corporation and the value of the amounts advanced align pro rata with their ownership interests, an inference arises that the funds should be characterized as capital contributions rather than debt.[111] When the shareholder holds debt in a ratio different from equity, the advance looks like bona fide debt.[112]

---

[109]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[110]Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 381.

[111]Ill. Tool Works Inc. & Subs. v. Commissioner, T.C. Memo. 2018-121, at *48.

[112]Slappey Drive Indus. Park, 561 F.2d at 583-584.

[*79] The sub debt was issued by an entity held entirely by the Ricketts family to an entity held entirely by the Ricketts family. CBH issued the sub debt to RAC Finance. RAC--an entity held entirely by the Ricketts family--owned 95% of CBH. RAC Finance is owned by RAC and MMR Investments and is managed by RAC. Marlene Ricketts owns MMR Investments, which is managed by Thomas Ricketts. The Ricketts family controlled both borrowing and issuing entities.

The Commissioner argues that because of the Ricketts family's overlapping interests in CBH and RAC Finance, it is possible that RAC Finance would not enforce the terms of payment. He cites Gooding Amusement Co. for the proposition that where identity of interest exists, the creditors will not enforce payment.[113] The Commissioner essentially argues that it is highly unlikely that Marlene Ricketts would sue her son, Thomas Ricketts, to enforce the debt. And this relationship is further entwined because Thomas Ricketts was a "decisionmaker" for both the equity holder and the sub debt lender. Because of the overlapping relationship between the lender and borrower of the sub debt, the Commissioner contends that this factor favors equity.

---

[113]Gooding Amusement Co. v. Commissioner, 23 T.C. 408, 419 (1954), aff'd, 236 F.2d 159 (6th Cir. 1956).

[*80] Petitioners disagree with the Commissioner's outlook and claim that RAC Finance would enforce repayment despite the interrelatedness of the lender and the borrower. Petitioners state that while this factor may invite closer scrutiny, it does not favor equity because the parties took all required steps to formalize the debt. Petitioners argue that this factor is neutral.

This factor favors equity. The interrelatedness of the lender and borrower is clear. Petitioners' arguments that RAC Finance would enforce payment and that the debt was properly formalized falls short of neutralizing this factor. These arguments about enforcement and formalities are considered under other factors. In finding that this factor indicates equity, we do not find or intend to imply that related parties such as family members cannot enforce debts against other family members. Rather, we look to the intertwined interests of the lender and borrower case-by-case. And with regard to RAC Finance and CBH, their interests are significantly intertwined.

### 9. Thinness of Capital Structure

The ninth factor is the "'thinness' of capital structure in relation to debt."[114] We examine the debt-to-equity ratio of an entity to determine whether the entity is

---

[114]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[*81] so thinly capitalized it is unlikely to make repayments.[115] If the borrower entity is too thinly capitalized, an advance may be better characterized as an equity investment.[116] Likewise, strong capitalization supports debt treatment.[117] No set ratio determines adequacy,[118] and capitalization requirements vary by industry.[119] A company in a low risk industry may appropriately be more leveraged than a company in a highly volatile or risky industry.[120]

CBH had a debt-to-equity ratio of 4:1. The Commissioner argues that the debt-to-equity ratio is closer to 1:1 if the sub debt is calculated as equity instead of debt. But the purpose of this factor is to consider whether the advance under consideration would leave the corporation undercapitalized. To evaluate that, we must consider the advance as debt. The Commissioner has incorrectly recharacterized the advance before applying the test.

---

[115]PepsiCo P.R., Inc. v. Commissioner, at *91.

[116]Ill. Tool Works Inc. & Subs. v. Commissioner, at *46.

[117]Ill. Tool Works Inc. & Subs. v. Commissioner, at *46-*47.

[118]Delta Plastics, Inc. v. Commissioner, T.C. Memo. 2003-54, 85 T.C.M. (CCH) 940, 943 (2003).

[119]NA Gen. P'ship & Subs. v. Commissioner, 103 T.C.M. (CCH) at 1922.

[120]NA Gen. P'ship & Subs. v. Commissioner, 103 T.C.M. (CCH) at 1922.

[*82] We must consider whether a 4:1 debt-to-equity ratio is sufficient capitalization for CBH. In the past, we have explicitly declined to adopt a specific ratio to determine adequate capitalization, and we will not do so here.[121] The debt or equity analysis is a facts and circumstances test, and a 4:1 capitalization ratio may suggest debt in one case and equity in another.

CBH was adequately capitalized, and this factor supports debt treatment. Professor Shaked concluded that CBH was adequately capitalized, and we find his reasoning persuasive. He considered the debt-to-equity ratios of other MLB franchises and found CBH's 4:1 ratio to be within the range of ratios of other teams. His analysis refutes the Commissioner's argument that CBH was undercapitalized for an MLB team. The Commissioner argues that the sub debt would have pushed CBH over the allowable debt limit under the MLB debt service rule because the rule would not treat the sub debt as debt. But the MLB debt service rule is not controlling. CBH was sufficiently capitalized with a debt-to-equity ratio of 4:1.

---

[121]Delta Plastics, Inc. v. Commissioner, 85 T.C.M. (CCH) at 943.

**[\*83]**       10.     <u>Ability To Obtain Outside Credit</u>

The tenth factor is the "ability of [the] corporation to obtain credit from outside sources."[122]  If the borrower could have obtained funds from an unrelated party on substantially the same terms, the factor supports debt characterization.[123]  An advance that could not have been obtained from an unrelated borrower is more likely equity.[124]  We recognize that the lender in a related-party transaction may offer more flexible terms than an unrelated party, so we consider whether the terms of the related-party loan are a "patent distortion of what would normally have been available."[125]

Petitioners argue that the terms of the sub debt were not a patent distortion and that the debt could have been sold to a third party.  They claim that the loan carried a reasonable interest rate, a reasonable maturity date, and adequate lender protections.  Petitioners argue that the PIK feature does not make the sub debt look like equity and that third parties showed interest in purchasing the debt.  Finally,

---

[122]<u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493.

[123]<u>Ill. Tool Works Inc. & Subs. v. Commissioner</u>, at \*48.

[124]<u>NA Gen. P'ship & Subs. v. Commissioner</u>, 103 T.C.M. (CCH) at 1923.

[125]<u>NA Gen. P'ship & Subs. v. Commissioner</u>, 103 T.C.M. (CCH) at 1923 (quoting <u>Litton Bus. Sys., Inc. v. Commissioner</u>, 61 T.C. at 379).

[*84] they cite the testimony of Professors Shaked and Chambers and Mr. Kahn who all found the terms reasonable.

The Commissioner argues the terms of the sub debt were not commercially reasonable. He claims that the interest rate was too low, that petitioners' experts overvalued the privileges, and that the subordination made it undesirable. And he notes that the attempts of the Ricketts family to sell a portion of the sub debt failed.

The parties and their experts dispute that the PIK feature was commercially reasonable. Both sides' experts agree that PIK features are not uncommon in subordinated debt agreements. But they disagree on the degree of risk associated with the PIK feature. The Commissioner's expert, Mr. Gellis, opined that PIK features carry more risk for the lender because the lender is not paid interest as it comes due; rather, the lender must wait until maturity to recoup the accumulated interest added to the principal. Mr. Kahn, an expert for petitioners, testified that the "PIK feature does not make the security any more equity like."

Both sides also contested the commercial reasonableness of the interest rate, particularly considering the privileges granted to the sub debt note holders. Petitioners argue that, while the stated interest rate was 6.5%, the effective rate was even higher. Professor Shaked, petitioners' expert, estimated that the sub debt rate of return was, in fact, over 8% because the value of the benefits granted to the

[*85] holder of the sub debt note increases the effective interest rate well above the stated 6.5%. But the Commissioner insists that this was not a commercially reasonable interest rate. He cites Mr. Gellis' report explaining that the interest should be 11%-16% to account for the inherent risk of the PIK feature and the private nature of the loans.

When considering the potential sale of the sub debt, the parties' experts disagree about whether an outside investor would have offered terms substantially similar to those of the sub debt. Professor Shaked, petitioners' expert, concluded that a third-party investor would have provided debt financing with terms similar to those of the sub debt, including the PIK feature and interest rate. Mr. Gellis, the Commissioner's expert, disagrees with this analysis. He opined that the subordinated notes were "issued on terms which would not have been available from unaffiliated third parties." He elaborated that the notes "served merely as a proxy for additional equity." And the subordination terms made the sub debt so toothless as to "render[] them no threat to the priority interests of the senior lenders."

Interestingly, in these cases, we have real world insight into whether the sub debt was commercially reasonable because the Ricketts family marketed the sub debt to potential buyers. In doing so, the Ricketts family offered certain privileges

**[*86]** such as priority parking, ticketing benefits, and private use of Wrigley Field. The parties disagree on why the sub debt was never sold. The Commissioner says the Ricketts family did not pursue the sale any further because no one was interested. Petitioners say the Ricketts family decided against outside participation. Both arguments are credible, but the fact remains that the notes were not sold. And even in marketing the debt, the Ricketts family felt the need to sweeten the deal in various ways including a right of first refusal on acquiring equity. We are not persuaded that the sub debt terms would have been attractive to third-party investors.

Petitioners have not met their burden of persuading us that CBH could have obtained similar debt from an unrelated third party or that the terms of this debt instrument were not patently unreasonable. The debt was marketed but never sold, and petitioners did not show that any third party expressed genuine interest in buying the sub debt. This factor favors equity.

### 11. Use of the Advance

The eleventh factor is the "use to which [the] advances were put."[126] If the borrower uses the advance to fund an acquisition of capital assets, the advance is

---

[126]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[*87] more likely equity.[127]  Use of the funds to meet operating needs of the business indicates debt.[128]

Petitioners at times argue both that this factor is neutral and that it indicates debt.  Petitioners say that use of the sub debt proceeds to fund the special distribution was neither an acquisition of capital assets nor funding of operating expenses, and we should therefore disregard the factor.  But later, petitioners argued that the factor should favor debt because the special distribution was part of the formation of a partnership that would "operate a well-established business."

The Commissioner argues the factor strongly favors equity.  He argues that the sub debt accounted for a portion of Tribune's proceeds from the sale of the Cubs.  He adds that the Ricketts family used the funds to acquire their 95% interest in CBH.

This factor strongly favors equity.  The sub debt proceeds were used to fund the special distribution.  The special distribution was an integral part of a transaction that resulted in a change of ownership.  This was not an everyday operating transaction; it was a significant change in the ownership of assets.

---

[127]PepsiCo P.R., Inc. v. Commissioner, at *96.

[128]PepsiCo P.R., Inc. v. Commissioner, at *96.

**[*88]**       12.    Failure To Repay

The twelfth factor is the "failure of [the] debtor to repay."[129]  Timely repayment of an advance may support debt treatment.[130]  Conversely, failure to repay the advance when due suggests equity.[131]  This is a significant factor.[132]  Petitioners argue that this factor favors debt since CBH made all required payments on the sub debt.  Although the Commissioner cannot dispute that CBH timely met its obligations on the sub debt, he correctly observes that CBH made its interest payments in kind, to the maximum extent permitted under the terms of the sub debt.

This factor favors debt.  CBH made all payments when required, whether in cash or in kind.

---

[129]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493.

[130]PepsiCo P.R., Inc. v. Commissioner, at *97.

[131]See Estate of Mixon, 464 F.2d at 410-411.

[132]Delta Plastics, Inc. v. Commissioner, 85 T.C.M. (CCH) at 944.

**[*89]**         13.   <u>Risk</u>

The thirteenth factor is the "risk involved in making advances."[133]  If

repayment was expected regardless of the success or failure of the business, the

factor favors debt.[134]  But if the funds were advanced for a risky purpose, we may

infer that the parties did not expect repayment in all circumstances, and we should

treat the advance as equity.[135]

Petitioners argue that the parties expected repayment, and the factor favors

debt.  The Commissioner insists that RAC Finance had limited remedies, leaving

any lender exposed to risk.  He adds that this factor indicates equity because the

sub debt was held by the same family that controlled CBH's equity.

This factor favors equity.  The risk borne by the Ricketts family was that of

an equity holder, not of a debt holder.  If a lender of bona fide debt does not

receive payment on its loan, it can sue to force a liquidation of the borrower's

assets or exercise other collection mechanisms.  An equity holder in the same

position is unlikely to force its business to liquidate to pay itself back uncollected

---

[133]<u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493.

[134]<u>Ill. Tool Works Inc. & Subs. v. Commissioner</u>, at *47.

[135]<u>Ill. Tool Works Inc. & Subs. v. Commissioner</u>, at *47.

[*90] debts. An equity holder bears the risk of loss if the borrower defaults. The Ricketts family bore this risk. If CBH defaulted on its obligations, RAC Finance had no real tool to enforce payment under the subordination agreement or the sub debt note. Payment of the sub debt was so relegated that it was the obligation of last priority in the company. Even if enforcement measures existed, the Ricketts family (as sub debt holders) would have to enforce their rights by causing the liquidation of CBH, the company they owned. This is beyond unlikely.

### C.     Conclusion: Equity

The sub debt was equity, not bona fide debt, for tax purposes. Although the sub debt had the superficial appearance of bona fide debt, it more closely resembles equity. Most of the factors we addressed signaled equity. Many of these factors--intent of the parties, right to enforce payment, risk, identity of the interest, and use of the advance--weigh significantly toward equity.

Because the sub debt is equity, it cannot be allocated to Tribune as recourse debt. The portion of the special distribution funded by the sub debt thus does not qualify under the debt-financed distribution exception of the disguised sale rules.

[*91] V.     Section 752:  Allocation of CBH's Partnership Liabilities

The next issue we must address is whether CBH's bona fide debt, the senior debt, should be allocated to Tribune, thereby allowing Tribune to offset a portion of the gain on the special distribution.

A.     General Rules on Allocating Partnership Liabilities

Section 752 and its regulations govern the allocation of partnership liabilities.  Under section 752(a), when a partner's share of a partnership liability increases, the amount of that increase is treated as a cash contribution or increased investment in the partnership by that partner.  Conversely, under section 752(b), a decrease in a partner's share of liabilities is treated as a distribution of cash.  The partner receiving an increase or decrease of partnership liabilities also increases or decreases their basis in their partnership interest, reflecting their changing investment in the partnership.[136]

These subchapter K rules mirror those of debt-financed property acquisitions by individuals.[137]  When an individual taxpayer uses debt financing to acquire property, the amount of borrowed funds is treated as additional cash invested in the

---

[136]Secs. 705(a), 722, 733, 752.

[137]Laura E. Cunningham & Noël B. Cunningham, The Logic of Subchapter K:  A Conceptual Guide to the Taxation of Partnerships 161 (6th ed. 2020).

[*92] acquired property and therefore increases the taxpayer's basis in the property.[138]  This  treatment is appropriate because it is assumed that the taxpayer will pay the debt, thereby actually investing the amount of cash that has been credited toward basis.[139]  And if the debt is not repaid, the borrower may have income as a result of the cancelation of that debt.[140]  The same treatment is appropriate in a partnership situation because, in the case of recourse debt, we assume the liable partners will pay the debt if the partnership cannot.[141]

It is not always clear which partner should receive the allocation of a liability.  If the venture is successful, the partnership itself will pay the liability and no partner will bear responsibility.  Therefore, to allocate a liability to a partner we must consider the worst-case scenario:  Which partner will have to pay the debt if the partnership is unable to do so?[142]  If a partner would be obligated to pay the

---

[138]Crane v. Commissioner, 331 U.S. 1, 10-11 (1947).

[139]Crane v. Commissioner, 331 U.S. at 13-14.

[140]Secs. 61(a)(12), 108(a).

[141]Stephen Schwarz & Daniel J. Lathrope, Fundamentals of Business Enterprise Taxation 55 (5th ed. 2012).

[142]See William S. McKee et al., Federal Taxation of Partnerships & Partners, para. 8.02[2] (4th ed. 2007).

[*93] liability in this worst-case scenario, the liability is recourse and is allocated to the partner who "bears the economic risk of loss" for the debt.[143]

Which partner is allocated a liability depends on whether the partners are general or limited partners and whether the liability is recourse or nonrecourse.[144] In a general partnership, the general partner is allocated liabilities.[145] CBH is an LLC and has no general partners.

Although Tribune is not a general partner, Tribune guaranteed collection of the debt. We have held that a partner's "guarantee of an otherwise nonrecourse note places each guaranteeing partner in an economic position indistinguishable from that of a general partner with liability under a recourse note--except that the guaranteeing partner's liability is limited to the amount guaranteed."[146]

If Tribune's senior debt guaranty is valid, the senior debt is a recourse liability allocated to Tribune. If not, it is a nonrecourse liability. Tribune argues that it is allocated the entire liability because it bears the economic risk of loss

---

[143]Cunningham & Cunningham, supra note 137, at 166.

[144]Schwarz & Lathrope, supra note 141, at 55.

[145]See McKee et al., supra note 142, para. 8.02[4][c].

[146]Abramson v. Commissioner, 86 T.C. 360, 374 (1986).

[*94] through its senior debt guaranty. The Commissioner disagrees, arguing that the senior debt guaranty does not sufficiently obligate Tribune under the constructive liquidation test. He further argues that the principal purpose of the senior debt guaranty was to create an illusion of economic risk for Tribune without creating any real risk for Tribune.

 B. Section 1.752-2(b)(1), Income Tax Regs.--the Constructive Liquidation Test

We first look at whether the senior debt guaranty sufficiently binds Tribune to the senior debt so that it bears the risk of loss in a default. If the debt is recourse to Tribune, it bears the risk of loss. A partner bears the risk of economic loss for a partnership liability if the partner would be obligated to make payment to the creditor if the partnership were constructively liquidated.[147]

In a constructive liquidation, all of the following events are deemed to occur simultaneously: (1) all of the partnership's liabilities become payable in full; (2) all of the partnership's assets (except property contributed to secure a partnership liability), including cash, become worthless; (3) the partnership disposes of all of its property in a fully taxable transaction for no consideration;

---

[147]Sec. 1.752-2(a) and (b)(1), Income Tax Regs.

[*95] (4) all items of income, gain, loss, or deduction are allocated among the partners as of the date of the constructive liquidation; and (5) the partnership liquidates.[148]

A partner's obligation to make a payment on the debt is based on the facts and circumstances and includes any statutory or contractual obligations.[149] Contractual obligations are not limited to the partnership agreement and include "guarantees, indemnifications, reimbursement agreements, and other obligations running directly to creditors."[150] Further, the regulations assume that partners who have obligations will actually perform those obligations, "unless the facts and circumstances indicate a plan to circumvent or avoid the obligation."[151]

The Commissioner argues that Tribune does not bear the risk of economic loss under the constructive liquidation test because the senior debt guaranty is not due and payable upon the constructive liquidation of CBH. He argues that Tribune's obligation to pay was "insulated by requiring a series of complex

---

[148]Sec. 1.752-2(b)(1), Income Tax Regs.

[149]Sec. 1.752-2(b)(3), Income Tax Regs.

[150]Sec. 1.752-2(b)(3)(i), Income Tax Regs.

[151]Sec. 1.752-2(b)(6), Income Tax Regs.

[*96] lawsuits to exhaust all remedies in law and in equity, after which Tribune could have sued CBH's lenders for not fully exhausting those remedies." Petitioners respond that the Commissioner is not properly applying the constructive liquidation test.

We agree with petitioners. Under the constructive liquidation test, Tribune bears the risk of economic loss for the senior debt. According to the terms of Tribune's guaranty of the senior debt, Tribune is obligated to pay when CBH fails to make a payment and the debt is accelerated, the creditors have exhausted their remedies, and the creditors have failed to collect the full amount of the debt. In a constructive liquidation, as contemplated by the test set forth in the regulations, the partnership fails to pay the debt, the debt comes due, the partnership assets are depleted, and the debt remains outstanding. Under the senior debt guaranty, Tribune would be required to pay in this circumstance.

The test here is whether Tribune must repay the senior debt creditors in a worst-case scenario. No other party was liable for the debt, no partnership assets secured the loans, and if the debt were due in full in the world of a constructive liquidation, the senior debt creditors would seek repayment from Tribune and no other party.

**[\*97]** The Commissioner also argues that the senior debt guaranty does not pass the constructive liquidation test because it creates a contingent obligation for Tribune. A contingent obligation is an obligation that "is subject to contingencies that make it unlikely that the obligation will ever be discharged."[152] The Commissioner claims that the requirement that creditors exhaust legal remedies before seeking repayment from Tribune make it "unlikely the obligation will ever be discharged," and that it is "far from clear" that the creditors would be capable of exhausting these legal remedies, making Tribune's collection obligation contingent.

The fact that the senior debt guaranty is a collection guaranty does not negate Tribune's ultimate obligation. And the requirements in the senior debt guaranty that lenders exhaust their remedies is not a contingency under section 1.752-2(b)(4), Income Tax Regs. If it were, most if not all collection guaranties would be disregarded as conferring an obligation under the constructive liquidation test, when the regulations clearly intend to treat guaranties--including collection

---

[152]Sec. 1.752-2(b)(4), Income Tax Regs.

[*98] guaranties--as obligations.[153] The requirement that the creditors exhaust other legal remedies before turning to Tribune does not vitiate Tribune's ultimate obligation to pay.

> C.    Section 1.752-2(j), Income Tax Regs.--the Specific Anti-Abuse Rule

The constructive liquidation test is subject to an anti-abuse rule. The anti-abuse rule disregards the payment obligation or treats it as the obligation of another person if it creates an illusion of the partner's economic risk of loss without actually subjecting the partner to real financial risk. Section 1.752-2(j)(1), Income Tax Regs., provides that the obligation may be disregarded if "facts and circumstances indicate that a principal purpose of the arrangement between the parties is to eliminate the partner's economic risk of loss with respect to that obligation or create the appearance of the partner or related person bearing the economic risk of loss when, in fact, the substance of the arrangement is otherwise."

The regulation articulates two situations and an example that illustrate the rule. The first situation does not apply here. The second states that an obligation

---

[153]See sec. 1.752-2(b)(3)(i), Income Tax Regs. (listing "guarantees" as a possible contract that could confer a payment obligation, and thus recourse liability status, upon a partner); see also sec. 1.752-2(f), Example (7), Income Tax Regs. (stating the guaranteeing partner bears the risk of economic loss for a loan).

[*99] is not recognized if "the facts and circumstances evidence a plan to circumvent or avoid the obligation."[154]  The example indicates that a partner with a deficit restoration obligation did not bear the economic risk of loss when that partner was a subsidiary with severely limited capital such that it could not be exposed to losses likely to be incurred by the partnership.[155]

The Commissioner seeks to apply the anti-abuse rule.  He believes that the possibility that the senior debt guaranty would ever be called was so remote that Tribune did not bear the risk of economic loss.  The Commissioner claims numerous "buffers" made it unlikely the senior debt guaranty would be called.  One of these buffers is that Tribune did not bear the risk of loss because the Ricketts family "was the true guarantor."  The Commissioner focuses on the Ricketts family's ownership of the Cubs as an intergenerational trophy asset, stating that because the Ricketts family committed to the Cubs as a long-term investment, the family was the "real guarantor."  However, he does not address the fact that in a constructive liquidation, the Cubs would be deemed worthless and the Ricketts family would lack an incentive to preserve its investment.  Further, the

---

[154]Sec. 1.752-2(j)(3), Income Tax Regs.

[155]Sec. 1.752-2(j)(4), Income Tax Regs.

[*100] Ricketts family was not a partner in CBH, and no transaction documents obligated RAC to pay the senior debt in a constructive liquidation. A recourse debt must be allocated to a partner, and there is no evidence that RAC was that partner.

Another buffer cited by the Commissioner is the operating support agreement. The Commissioner argues that the operating support agreement, which memorialized the Ricketts' family's agreement to place $35 million in an escrow account to fund Cubs operating expenses as needed, is the "real guarantee." But CBH could not use these escrowed funds to pay its debt. Instead, the escrow account was established so that the Cubs could continue to operate if its cashflow decreased significantly. This was a genuine concern because anything that stopped games from being played, such as a players' strike, would dramatically decrease the team's cashflow. The Commissioner presented no persuasive evidence that the operating support agreement served the alternative purpose of guaranteeing the senior debt, particularly when the agreement already served a crucial function. In a constructive liquidation where CBH could pay neither its debts nor its operating expenses, CBH's creditors would not look to the Ricketts family for payment under the operating support agreement, they would look to Tribune for payment of the debt.

[*101] We decline to address the remaining buffers argued by the Commissioner. Many of the Commissioner's "buffers" resemble common lender protections. The existence of oversight and protections to prevent a doomsday scenario does not render the senior debt guaranty illusory. Furthermore, the Commissioner's argument that the senior debt guaranty is unlikely to be called is without merit. By relying on the unlikeliness, he concedes the possibility. The constructive liquidation test does not posit an expected occurrence; rather, it tests the worst-case scenario, going so far as to assume that even cash is rendered worthless. Therefore, the probability of Tribune's fulfillment of its promise in the senior debt guaranty is irrelevant. It is clear that if CBH could not pay its senior debt, Tribune would have to do so. The anti-abuse rule does not apply here.

D.    Canal Corp.

The anti-abuse rule and the example provided by section 1.752-2(j), Income Tax Regs., were applied by this Court in Canal Corp.[156] To date, that is the only other case that has considered the anti-abuse rule of section 1.752-2(j), Income Tax Regs. Unsurprisingly, both petitioners and the Commissioner argue that it supports their positions. As here, Canal Corp. dealt with a transaction intentionally

---

[156]Canal Corp. v. Commissioner, 135 T.C. 199 (2010).

[*102] structured to fit within the debt-financed distribution rules. In that case, we applied the anti-abuse rule to invalidate an indemnification, noting that the facts and circumstances were analogous to an example in the regulations.

In Canal Corp., Chesapeake Corp. sought to sell its commercial tissue business, but it had a low tax basis in the asset.[157] Chesapeake's commercial tissue business was held in its wholly owned subsidiary, Wisconsin Tissue Mills, Inc. (WISCO).[158] Georgia Pacific, a commercial lumber and paper products company, wished to purchase WISCO, but Chesapeake's low tax basis in WISCO led the company to disfavor an outright sale.[159]

To increase after-tax proceeds to Chesapeake and lower the purchase price paid by Georgia Pacific, the parties agreed to a leveraged partnership structure.[160] WISCO contributed its commercial tissue assets to a new partnership in exchange for a minority interest, and Georgia Pacific contributed its relevant assets to the

---

[157]Chesapeake Corp. changed its name to Canal Corp. after the relevant tax years but before we issued the Opinion in Canal Corp. Canal Corp. v. Commissioner, 135 T.C. at 200 n.2. The Opinion refers to the taxpayer as Chesapeake, and we will do the same.

[158]Canal Corp. v. Commissioner, 135 T.C. at 201.

[159]Canal Corp. v. Commissioner, 135 T.C. at 203.

[160]Canal Corp. v. Commissioner, 135 T.C. at 203.

[*103] new partnership in exchange for the majority interest.[161]  That partnership

then borrowed from a third party and distributed the debt proceeds to WISCO who

then distributed the proceeds to Chesapeake.[162]

Georgia Pacific guaranteed the debt, and WISCO indemnified Georgia

Pacific.[163]  Chesapeake opted against indemnifying Georgia Pacific to protect its

assets in case payment became due.  WISCO attempted to limit its risk of being

called to pay the indemnity.  The indemnity covered only the debt principal,

required the partnership's assets to be exhausted before WISCO paid, and provided

that if WISCO made a payment it would receive an increased interest in the

partnership.  WISCO was not required to maintain any net worth and had almost

no assets other than its interest in the joint venture.[164]

In Canal Corp., the Commissioner successfully argued that WISCO did not

bear the economic risk of loss and that the anti-abuse rule applied to disregard the

---

[161]Canal Corp. v. Commissioner, 135 T.C. at 207.

[162]Canal Corp. v. Commissioner, 135 T.C. at 207-208.

[163]Canal Corp. v. Commissioner, 135 T.C. at 204-205.

[164]Canal Corp. v. Commissioner, 135 T.C. at 205.

[*104] obligation.[165] We found that the indemnity was structured to insulate WISCO from liability and that WISCO lacked sufficient assets to pay the indemnity.[166] And in the unlikely event that WISCO would have to pay, it would receive an increased interest in the partnership as compensation.[167] We held that the indemnity limited WISCO's economic exposure and Georgia Pacific, not WISCO, was truly the partner at risk if the partnership could not pay the debt.[168]

WISCO's indemnity is not analogous to the senior debt guaranty. At no point did WISCO have the assets to pay the amount of the indemnity; in contrast, Tribune likely had sufficient assets to fulfill its obligations under the senior debt guaranty. Further, the likelihood that WISCO would ultimately pay the indemnity was more attenuated than Tribune's potential obligation to satisfy the senior debt guaranty. In a constructive liquidation scenario, Georgia Pacific would have had to honor its guaranty to the third-party lenders, then seek repayment first from the partnership, and then seek indemnification from an undercapitalized WISCO,

---

[165] Canal Corp. v. Commissioner, 135 T.C. at 210, 212-213.

[166] Canal Corp. v. Commissioner, 135 T.C. at 213-214.

[167] Canal Corp. v. Commissioner, 135 T.C. at 213.

[168] Canal Corp. v. Commissioner, 135 T.C. at 213.

[*105] which because it was undercapitalized, would have left Georgia Pacific with the liability. Under Tribune's senior debt guaranty, the third-party lenders would seek payment from Tribune after first exhausting other legal avenues--a common term in collection guaranties. Further, the indemnity in Canal Corp. granted WISCO an increased interest in the partnership if exercised. This is a significant distinguishing fact. If Tribune had to honor the senior debt guaranty, its interest in CBH would not increase; it would simply be out that amount. WISCO's increased interest would have granted it a benefit for honoring the indemnity agreement. Tribune would receive no such compensation.

But the Commissioner sees a greater connection between WISCO and Tribune. He argues that Tribune was undercapitalized like WISCO because Tribune was in bankruptcy when it executed the senior debt guaranty. But WISCO lacked the assets to pay the indemnity at the time of the transaction, and its assets were not expected to increase. While Tribune was bankrupt when it executed the senior debt guaranty, it had sufficient assets to pay the senior debt guaranty upon execution and, unlike WISCO, expected its net worth to increase.

VI.   General Anti-Abuse Rule and Substance Over Form

The Commissioner argues that section 1.701-2(b), Income Tax Regs., and the common law doctrine of substance over form apply to invalidate the Cubs

**[*106]** transaction and the nontax treatment of the special distribution. Section 1.701-2(b), Income Tax Regs., which establishes a general anti-abuse rule for partnerships, and the doctrine of substance over form are coextensive and function together when necessary.[169] But neither the general anti-abuse rule nor the substance over form doctrine applies to the Cubs transaction.

    A.    <u>Section 1.701-2, Income Tax Regs.: The Subchapter K Anti-Abuse Rule</u>

In addition to the specific anti-abuse rule provided by section 1.752-2(j), Income Tax Regs., regulations under subchapter K include a general anti-abuse rule. Section 1.701-2(a), Income Tax Regs., provides that the intent of subchapter K is to allow taxpayers to conduct business jointly, with flexibility as to the economic arrangements between partners, without incurring an entity level tax. For a taxpayer to take advantage of subchapter K, it must first meet three requirements:

---

[169]The general anti-abuse rule overlaps significantly with several common law doctrines. When the Secretary proposed the partnership general anti-abuse regulation, commentators questioned whether it simply codified existing common law doctrines, especially the substance over form and business purpose doctrines. T.D. 8588, 1995-1 C.B. 109, 112. The preamble to the final regulation explained that "[w]hile the fundamental principles reflected in the regulation are consistent with the established legal doctrines, those doctrines will also continue to apply." Id. at 112.

**[\*107]** (1) The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose.

(2) The form of each partnership transaction must be respected under substance over form principles.

(3) Except as otherwise provided in this paragraph (a)(3), the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income). * * *[170]

If a taxpayer does not meet these requirements, it fails the anti-abuse rule under section 1.701-2, Income Tax Regs.

The Commissioner argues that the anti-abuse rule of section 1.701-2, Income Tax Regs., applies to invalidate the senior debt guaranty.[171] He argues that the regulation "requires that each component of a partnership transaction have a substantial business purpose." The Commissioner claims that the senior debt guaranty lacks a substantial business purpose and therefore violates the general

---

[170]Sec. 1.701-2(a), Income Tax Regs.

[171]The Commissioner argues that the general anti-abuse rule and the doctrine of substance over form apply to invalidate both the sub debt guaranty and the senior debt guaranty. However, because we held that the sub debt is not bona fide debt, we focus our discussion here on the senior debt guaranty.

[*108] anti-abuse rule. To support this assertion, the Commissioner points to the benefits lacking in the senior debt guaranty: It did not improve Tribune's credit or decrease interest rates on the loans; Tribune did not receive payment to issue the senior debt guaranty; and the senior creditors did not request that Tribune guarantee the loans. As further evidence of the senior debt guaranty's lack of business purpose, the Commissioner claims that the credit rating agencies "gave little or no credence" to the senior debt guaranty. And Tribune itself did not recognize the senior debt guaranty in its financial statements under the GAAP requirements. Because the senior debt guaranty lacked a business purpose, argues the Commissioner, it served only to lessen Tribune's tax liability and fails the general anti-abuse rule.

Petitioners dispute the Commissioner's interpretation of section 1.701-2, Income Tax Regs. Petitioners argue that the Commissioner inaccurately construes the regulation to require a business purpose for "each component" of a transaction instead of the transaction as a whole. They point to the examples in the regulation and courts' application of the regulation to support their contention.

We agree with petitioners. The examples in the regulation establish that a partnership must have a genuine business purpose for forming the partnership, not that every component of the partnership's formation have a separate business

[*109] purpose.  The examples find that a partnership passes the anti-abuse rule when it is formed to "conduct a bona fide business,"[172] such as real estate management, making joint investments, and owning and operating a building.[173]  A partnership does not have a business purpose when the partners lack the intent to genuinely pursue a venture under the partnership.  In such a situation, the transactions did not have a business purpose because "any purported business purpose for the transaction is insignificant in comparison to the tax benefits" enjoyed by the partners if the partnership form were respected.[174]  Accordingly, the transactions lacked a business purpose and should be disregarded.[175]

This business purpose requirement is thus a broad provision applying to the function of the partnership as a whole.  It is not intended to apply to every agreement into which the partnership or its partners enter.  That level of minutiae was not contemplated by the general anti-abuse rule.  The courts have interpreted business purpose requirements to apply to whether the entities engaged in the

---

[172]Sec. 1.701-2(d), Examples (1) and (2), Income Tax Regs.

[173]Sec. 1.701-2(d), Examples (4)-(6), Income Tax Regs.

[174]Sec. 1.701-2(d), Examples (7) and (8), Income Tax Regs.

[175]Sec. 1.701-2(d), Examples (7) and (8), Income Tax Regs.

[*110] transaction are genuine and profit-motivated or whether the ultimate intent of the transaction had a nontax purpose.[176] In determining whether a transaction has a nontax motive, we assess whether the transaction alters the taxpayer's economic position.[177] CBH, without a doubt, had a bona fide business purpose. Tribune and RAC created CBH to hold and operate the Cubs, an endeavor which CBH certainly pursued. The transaction was not a sham and resulted in significant economic outcomes to Tribune and RAC. No evidence shows that CBH lacked a business purpose.

Even if the business purpose requirement did not apply to the Cubs transaction as a whole, the Commissioner's attempt to discredit the senior debt

---

[176]See, e.g., Kraft Foods Co. v. Commissioner, 232 F.2d 118, 128 (1956) (holding that because the parties that entered into the transaction had "separate and real corporate personality" and "engaged in certain objective acts with the intent of creating legal rights and duties" the transaction had a business purpose); DTDV, LLC v. Commissioner, T.C. Memo. 2018-32, at *39 ("[T]he relevant substantive question is whether the taxpayer had a purpose other than obtaining tax benefits manifestly inconsistent with congressional intent."); Countryside Ltd. P'ship v. Commissioner, T.C. Memo. 2008-3, 95 T.C.M. (CCH) 1006, 1018 (2008) (stating that the "ultimate transaction * * * accomplish[ed] a legitimate economic or business purpose").

[177]See Countryside Ltd. P'ship v. Commissioner, 95 T.C.M. (CCH) at 1018 (stating that the transaction had business purpose because it changed the economic positions of those involved).

[*111] guaranty is unpersuasive. The purpose of a guaranty is to provide an ultimate payor on a loan if the original obligor is unable to pay. A valid guaranty ensures that the guarantor will shoulder the ultimate economic burden of a debt. Because a guaranty certifies that a debt will be paid, it may convey additional benefits to the parties, such as a favorable interest rate, an improved credit standing, and a payment from the creditor to the guarantor. The Commissioner cites these benefits as proof of a guaranty's "business purpose," and insists that because the senior debt guaranty lacked these enhancements, it is not a valid guaranty. But a guaranty does not require a separate purpose other than pledging ultimate payment for a loan; additional perks may be desired but are not the purpose of the guaranty. Conditioning the validity of a guaranty on its provision of additional extrinsic benefits overlooks its essential function. The Commissioner's position is an incorrect analysis of the circumstances under which we will honor a guaranty. We honor a guaranty if the guarantor has ultimate economic responsibility for the loan. As we discussed at length, Tribune bore ultimate responsibility for the senior debt.

The Commissioner's claim that the senior debt guaranty had no real-world consequences is similarly false. He argues that the senior debt guaranty lacked substance because Tribune did not report it on its financial statements per GAAP

[*112] guidelines.[178]  As Mr. Erickson, an expert for petitioners, credibly testified,

Tribune properly followed these guidelines when it reported the guaranties had no

contingent or noncontingent value but disclosed its economic exposure from the

guaranties.  Dr. Skinner, expert for the Commissioner, affirmed that Tribune

accurately represented the guaranties on its financial statements.  Mr. Erickson also

credibly testified that the "GAAP value does not equate to the economic value"

because the GAAP calculation measures the likelihood of payment, not the

economic value of a guaranty.  Dr. Skinner seemed to agree when he calculated the

economic value of the guaranties at $6,120,000 to $18,860,000.  The

Commissioner's claim that Tribune's GAAP reporting reflects the guaranties' true

lack of substance is thus inaccurate.  The reporting indicates Tribune's assessment

that the likelihood it would be called to service the guaranties was remote.  As

discussed above, a remote possibility that a guaranty will be called is still a

---

[178]The GAAP guidance relevant to Tribune's guaranties was the Financial Accounting Standards Board's Interpretation No. 45 (FIN No. 45), "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others."  FIN No. 45 specified that entities must recognize the fair value of guarantees as liabilities on their balance sheet for contingent and noncontingent components of the guarantees.  If a guarantee does not have value, GAAP does not require the entity to report its value.  But even if an entity's guarantees lack value, it must still disclose its guarantees on financial statements.

[*113] possibility and does not invalidate a guaranty. Furthermore, the guaranties had economic value, and the senior debt guaranty is not a sham or an illusory agreement created solely for tax purposes.

The guaranties affected Tribune's credit rating. The Commissioner claims that the credit agencies gave the guaranties "little or no credence," but that is not true. In its credit rating analyses of Tribune, S&P accounted for the guaranties when calculating Tribune's leverage and risk. In its 2016 credit report, it attributed $100 million of CBH's debt to Tribune as a result of the guaranties. According to Ms. Shoesmith, who worked on Tribune's credit report at S&P, this additional $100 million of attributable debt affected Tribune's credit rating by increasing its debt to earnings ratio by 0.4. Not only did S&P give more than "a little" credence to the guaranties, but the guaranties had a real-world effect on Tribune's credit rating. The senior debt guaranty had genuine consequences outside of its tax benefits.

The Commissioner makes two other arguments as to why the senior debt guaranty fails the general anti-abuse rule. First is the Commissioner's claim that the senior debt guaranty was a phony guaranty that was "trumped by the cash-backed competing guarantee of the Ricketts family," the operating support agreement. But the operating support agreement did not guarantee the senior debt

**[*114]** and was established to fund necessary Cubs operating costs. In fact, the operating support agreement expressly prohibited CBH from using the operating support agreement funds to satisfy debts. This argument is not persuasive.

Second, the Commissioner states that the senior debt guaranty's status as a collection guaranty makes the likelihood of Tribune's ultimate payment too attenuated. He cites the protections embedded in the senior debt guaranty requiring the lenders to exhaust other legal remedies before seeking payment from Tribune and the protections in the debt structure that minimized the risk of the senior debt guaranty's being called. Collection guaranties are valid guaranties. The regulations in fact provide an example where the partner who has a guaranty of collection is allocated the debt as a recourse liability.[179] We will not invalidate a collection guaranty simply because the lenders must seek payment from other potential sources before turning to the guarantor. Similarly, we will not invalidate a guaranty because the borrowing entity structured its debt to mitigate the risk of default. An entity may (and is perhaps encouraged to) create a debt structure that maximizes its ability to satisfy the terms of its debt agreements. Tribune's foresight on this issue does not invalidate the senior debt guaranty.

---

[179]Sec. 1.752-2(j)(4), Income Tax Regs.

**[\*115]** B.    Application of the Substance Over Form Doctrine

The doctrine of substance over form embodies the concept that the economics of a transaction, not just the formal paper steps, should determine its tax treatment.  As described by the Joint Committee on Taxation:

> The concept of the substance over form doctrine is that the tax results of an arrangement are better determined based on the underlying substance rather than an evaluation of the mere formal steps by which the arrangement was undertaken.  For instance, two transactions that achieve the same underlying result should not be taxed differently simply because they are achieved through different legal steps.  The Supreme Court has found that a "given result at the end of a straight path is not made a different result because reached by following a devious path." * * *[180]

The doctrine arose in Gregory v. Helvering where the Supreme Court considered a transaction that complied with the text of the Code, but not its intended purpose:

> The whole undertaking, though conducted according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else.  The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute.  To hold

---

[180]Staff of J. Comm. on Taxation, Study of Present-Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring and Reform Act of 1998 (Including Provisions Relating to Corporate Tax Shelters) (Vol. I), at 195 (J. Comm. Print 1999) (quoting Minn. Tea Co. v. Helvering, 302 U.S. 609, 613 (1938).

**[\*116]** otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.[181]

The Supreme Court also stated the test as "whether what was done, apart from the tax motive, was the thing which the statute intended."[182]  We use the doctrine of substance over form to "determine the true nature of a transaction and appropriately recast it for Federal income tax purposes."[183]  But we apply these principles "only when warranted and generally respect the form of a transaction."[184]

When form and substance align--even when the form provides additional tax benefits to the taxpayer--the form will be respected.  But when form and substance do not align, it is assumed that tax consequences inappropriately drove that decision.  A leading treatise has explained:

> If a transaction is consummated in a form that fairly reflects its substance, it ordinarily passes muster despite the conscious pursuit of tax benefits; in this case, the choice of form resembles an election provided by statute.  On the other hand, if the form does not coincide with the transaction's substance, the fact that it was negotiated at

---

[181]Gregory v. Helvering, 293 U.S. at 470.

[182]Gregory v. Helvering, 293 U.S. at 469.

[183]Exelon Corp. v. Commissioner, 147 T.C. 230, 299 (2016), aff'd, 906 F.3d 513 (7th Cir. 2018).

[184]Exelon Corp. v. Commissioner, 147 T.C. at 299.

**[\*117]** arm's length by unrelated taxpayers does not protect it against attack, because the assumption of opposing tax interests is inapplicable.[185]

Petitioners argue that substance over form should not apply because they complied with the disguised sale rules. They assert that the question posed by the doctrine of substance over form is whether the steps of the transaction substantively took place. And they argue the doctrine does not apply "where a taxpayer has dutifully structured a transaction in compliance with a detailed regulatory regime that implements Congress's intent." Petitioners claim that Tribune may reap the tax benefits of the disguised sales rules if:

> (a) the parties actually contributed their respective assets to form a bona fide partnership,
>
> (b) the partnership in fact borrowed the Senior and Subordinated Debt;
>
> (c) the Subordinated Debt in fact constitutes true debt for tax purposes, and
>
> (d) Tribune provided guarantees of the Senior and Subordinated Debt that qualify as valid guarantees under section 752.

Petitioners claim that because Tribune followed--in substance as well as form--the prescribed steps of a disguised sale, the transaction should be respected.

---

[185]Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, para. 4.3.3, at 4-40 (3d ed. 1999).

[*118] The Commissioner argues in the alternative that we should recast the Cubs transaction as an outright sale under the substance over form doctrine. He argues that in substance the Cubs transaction was a sale of 95% of the team's assets and was "orchestrated as a partnership contribution in form solely to avoid the payment of income tax." He further alleges that "[f]rom the outset, all parties knew the transaction was in substance a sale, that Tribune wanted to part with the Cubs, that the transaction had to be structured in a certain manner, and that the structure existed to provided Tribune tax benefits."

What the Commissioner is describing is a disguised sale. Petitioners reported this disguised sale as such on their tax returns and have consistently identified the Cubs transaction as a disguised sale. Respondent acknowledged the same on the FPAA he issued with respect to CBH and the notice of deficiency he issued to Tribune.

The Cubs transaction was a disguised sale in both form and substance. The economic reality of this transaction lies squarely within the intent of the disguised sale statute. The parties to the transaction formed a bona fide partnership that operates the Cubs franchise with assets contributed by Tribune. And the partnership in fact distributed cash to Tribune. This transaction also substantively fits into the debt-financed distribution exception for a disguised sale, receiving the

[*119] distribution tax free up to the amount of the senior debt guaranteed by Tribune.  CBH borrowed the senior debt, and Tribune guaranteed the senior debt. When such a transaction is explicitly provided for by Congress and followed by a taxpayer in both substance and form, we will not recharacterize it.[186]  The doctrine of substance over form is applied to prevent taxpayers from mislabeling transactions to achieve a desired tax consequence.[187]  Petitioners did not mislabel the transaction here; the economic substance of the Cubs transaction is a disguised sale with a debt-financed distribution, a structure contemplated by both the statute and the regulations.

VII.    The Utay Expenses

The final issue we address is whether Tribune must capitalize the Utay expenses.  Tribune paid Mr. Utay's group $2.5 million to reengage in the bidding process for the Cubs after negotiations with the Ricketts family stalled.  This $2.5 million covered bidding expenses--mostly legal fees--incurred by the group. Tribune deducted this expense.

---

[186]Esmark, Inc. v. Commissioner, 90 T.C. 171, 200 (1988), aff'd, 886 F.2d 1318 (7th Cir. 1989).

[187]See Benenson v. Commissioner, 910 F.3d 690, 699 (2d Cir. 2018), rev'g and remanding T.C. Memo 2015-119.

[*120]  The Commissioner denied the deduction in Tribune's notice of deficiency. He argues that the $2.5 million should be capitalized under section 263 because Tribune incurred the expense to facilitate an acquisition of a trade or business or a change in its capital structure.  Section 263 denies deductions for any improvements or betterments to the taxpayer's property.[188]  Taxpayers must instead capitalize costs paid to facilitate the acquisition of assets or ownership in a trade or business.[189]

Petitioners argue that Tribune correctly deducted the expense under section 165(a) as an abandonment loss.  They claim that the Utay expenses are deductible as expenses related to an abandoned transaction because Mr. Utay's group did not prevail in the bidding process.

For Federal income tax purposes, whether a payment is a deductible expense or a capital expenditure concerns the timing of the taxpayer's recovery of the cost. A business expense is deductible for the year it is incurred; a capital expenditure is amortized or depreciated over the life of the relevant asset.[190]  Whether an expense

---

[188]Sec. 263(a)(1).

[189]Sec. 1.263(a)-5(a), Income Tax Regs.

[190]INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83-84 (1992).

[*121] should be capitalized or deducted turns on whether the "payment serves to create or enhance * * * a separate and distinct additional asset."[191]  When an expense does not create such an asset, the question hinges on whether the expense will generate significant benefits for the taxpayer extending beyond the taxable year.[192]

Petitioners cite two cases in support of their argument:  A.E. Staley Mfg. Co. & Subs.[193] and Santa Fe Pac. Gold Co.[194]

In A.E. Staley Mfg. Co. & Subs., the taxpayer feared a potential hostile takeover.  To defend itself, the taxpayer hired investment bankers to prepare for a takeover, advise it, and assist it in the event a takeover occurred.[195]  The investment bankers suggested that the taxpayer find a friendly "white knight" investor to waylay an adversarial one, which the taxpayer proceeded to do.[196]  But

---

[191]Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 354 (1971).

[192]Metrocorp, Inc. v. Commissioner, 116 T.C. 211, 221-222 (2001).

[193]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d 482 (7th Cir. 1997), rev'g 105 T.C. 166 (1995).

[194]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. 240 (2009).

[195]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 484.

[196]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 484.

[*122] the taxpayer's "white knight" was an enemy in disguise and began buying additional shares against the taxpayer's wishes.[197] During this takeover, the investment bankers discussed with the taxpayer alternatives to the hostile tender offer, but the tender offer was ultimately accepted by the taxpayer's board.[198] The taxpayer deducted the fees it paid to the investment bankers for their services in response to the hostile takeover.[199]

The Commissioner argued that the taxpayer should have capitalized those expenses under section 263.[200] The Court of Appeals for the Seventh Circuit explained that capitalized costs are those expended to better an entity or "produce future benefits"; in contrast, the taxpayer was "engaged in the process of defending its business from attack" and thus trying to maintain the status quo.[201] It incurred the expenses in an attempt to prevent the transaction that ultimately occurred.[202]

---

[197]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 484-485.

[198]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 485.

[199]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 485.

[200]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 487.

[201]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 489.

[202]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 489-490.

**[\*123]** The Court of Appeals held that the expenses the taxpayer incurred to defend itself from the takeover were deductible under section 162 and those incurred to find alternative transactions to the takeover were deductible under section 165(a).[203]

Petitioners also cite Santa Fe Pac. Gold Co. [204]  As in A.E. Staley Mfg. Co. & Subs., the taxpayer in Santa Fe Pac. Gold Co. fell victim to a hostile takeover. The taxpayer became vulnerable to a takeover, and a hostile firm began its pursuit to form a merger against the taxpayer's wishes.[205]  To avoid a takeover from the hostile firm, the taxpayer entered into a merger agreement with a "white knight" firm; the agreement included a termination fee clause.[206]  Ultimately, the hostile firm succeeded in its takeover, forcing the taxpayer to pay the termination fee to

---

[203]A.E. Staley Mfg. Co. & Subs. v. Commissioner, 119 F.3d at 491.

[204]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. 240.

[205]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 245-250.

[206]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 252.

[*124] the "white knight."[207]  The taxpayer deducted the termination fee, and the

Commissioner denied its deduction.[208]

We held that the taxpayer properly deducted the termination fee under

sections 162 and 165.[209]  We found that the "termination fee was intended to * * *

deter competing bids" and reimburse the "white knight" if the deal fell through.[210]

The fee was deductible under section 162 because it was paid in pursuit of

defending the taxpayer and did not "produce[] any long-term benefit."[211]  We

emphasized that the termination fee was not part of the ultimate merger because

"[t]he two transactions were separate:  (1) A white knight transaction; and (2) a

hostile takeover."[212]  In finding that the taxpayer could also deduct the fee under

section 165(a), we rejected the Commissioner's argument that the "white knight"

merger and hostile takeover represented two separate alternatives to achieve the

---

[207]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 258-259.

[208]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 259-260.

[209]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 276-279.

[210]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 272.

[211]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 272.

[212]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 273-274.

[*125] same goal.[213]  We stated that the facts showed that the taxpayer's goal was to avoid restructuring and it was forced into a new capital structure.  Again, we emphasized that the two plans were "separate and distinct" and "[t]he two possible combinations were not part of an overall plan by * * * [the taxpayer] to change its capital structure."[214]

The Utay expenses should be capitalized.  Tribune paid $2.5 million to Mr. Utay's group to facilitate the Cubs transaction that actually closed.  Tribune had a specific partnership structure and transaction it wished to execute.  It initiated this transaction and deliberately chose its bidders through a careful process before selecting the Ricketts family as the final bidder.  When negotiations with the Ricketts family stalled, Tribune approached Mr. Utay to reengage.  Mr. Utay

---

[213]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 277-278.

[214]Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. at 278.  In coming to this conclusion, we cited two cases that allowed taxpayers' deductions under sec. 165(a).  The first was Sibley, Lindsay & Curr Co. v. Commissioner, 15 T.C. 106 (1950), where the taxpayer's bankers created three separate restructuring plans and deducted the costs of the two plans it did not pursue.  We allowed the deductions for the costs of the two plans because they were distinct from the plan the taxpayer pursued.  Id. at 110.  The second was United States v. Federated Dept. Stores, Inc. (In re Federated Dep't Stores, Inc.), 171 B.R. 603, 612-613 (Bankr. S.D. Ohio 1994), where the court allowed the taxpayer to deduct termination fees related to a failed "white knight" transaction because the successful hostile takeover and the "white knight" merger were two mutually exclusive transactions.

[*126] believed that Tribune reached out because it was intent on finding a buyer for the Cubs. Tribune thus paid Mr. Utay's group to facilitate the Cubs transaction.

Under these facts, it is clear that the payment was made to close the transaction that was ultimately consummated. Tribune paid the Utay expenses in an effort to achieve one of two binary results, to close the transaction with either the Ricketts family or the Utay group. Had the Utay group succeeded in getting to the closing table, the Utay expenses would have been capitalized into that transaction under section 263. But the evidence is clear that Tribune paid the amount principally to push the Ricketts family to the closing table. The expenses were incurred to facilitate the transaction that actually closed and thus must be capitalized into that transaction under section 263.

Petitioners' argument that the expense is a loss from an abandoned transaction is not supported. Both A.E. Staley Mfg. Co. & Subs. and Santa Fe Pac. Gold Co. allowed deductions for sums paid in an attempt to avert a hostile takeover. In each case, the transaction that created the capital asset was one the taxpayer paid to avoid. There were two "separate and distinct" plans in the cited cases: the transaction that occurred and a plan to avert that transaction. In both cases, the plan to avert the transaction was thus abandoned. That is not the situation here. Tribune was focused on creating the transaction that ultimately

[*127] occurred. It did not attempt to find alternatives to the Cubs transaction but to facilitate it. When the Ricketts family hesitated, Tribune opened up the possibility of proceeding with Mr. Utay's group and paid to do so. Whether Tribune moved forward with the Ricketts family or Mr. Utay's group, the overall plan to create a new capital asset was the same. Tribune paid the expenses in pursuit of this plan. Thus, no plan was ever abandoned, and Tribune did not suffer abandonment losses. The Utay expenses must be capitalized.

VIII. Conclusion

Tribune's 2009 disposition of the Chicago Cubs was a disguised sale to the newly formed partnership CBH. The advance characterized as sub debt was equity for tax purposes, and the portion of the distribution attributable to the sub debt cannot offset Tribune's recognized gains from the disguised sale. The senior debt guaranty was bona fide, and the portion of the distribution attributable to the senior debt guaranty is a nontaxable debt-financed distribution. Finally, the $2.5 million Utay expenses must be capitalized. The issue of penalties will be addressed in further proceedings.

Appropriate decisions will be entered

following further proceedings regarding

penalties.